

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-25-1995

# IN RE: Indian Palms

Precedential or Non-Precedential:

Docket 94-5265

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"IN RE: Indian Palms" (1995). *1995 Decisions*. Paper 197.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/197

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 94-5265


IN RE:  INDIAN PALMS ASSOCIATES, LTD.,
B.C. 90-25765 (WFT)

NANTUCKET INVESTORS II

v.

CALIFORNIA FEDERAL BANK; INDIAN PALMS ASSOCIATES, LTD.
OFFICE OF UNITED STATES TRUSTEE

*Argo Loan Limited Partnership
Appellant

*(Pursuant to Court's 9/12/94 order)


On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 93-cv-04519)


Argued:  December 7, 1994

BEFORE:  STAPLETON, ROTH and LEWIS, <u>Circuit Judges</u>

(Opinion Filed July 25, 1995)

Jonathan E. Polonsky (Argued)
Thomas P. Higgins
Thelen, Marrin, Johnson & Bridges
330 Madison Avenue, Suite 1100
New York, New York  10017-5001
  Attorneys for Appellee

Paul Kizel (Argued)

Ravin, Sarasohn, Cook, Baumgarten,
Fisch & Baime
103 Eisenhower Parkway
Roseland, NJ  07068
   Attorneys for Appellant

STAPLETON, Circuit Judge:

Creditor California Federal Bank ("CalFed"), holder of a first mortgage against the debtor partnership's primary asset ("the property"), seeks relief from the automatic stay in a Chapter 11 bankruptcy proceeding in order to initiate foreclosure proceedings.[0] Nantucket Investors II ("Nantucket Investors"), who holds a second mortgage against the property, opposes the lifting of the stay.

The bankruptcy court granted CalFed relief from the stay under 11 U.S.C. § 362(d)(1), finding that CalFed's interest in the property was not being adequately protected during the pendency of the bankruptcy proceedings. The district court reversed, finding that CalFed's current claim, having been reduced by post-petition payments, was less than the bankruptcy court had determined and was adequately protected. The district court also found that the debtor retained equity in the property and that relief from the automatic stay would therefore be unavailable under 11 U.S.C. § 362(d)(2) as well.[0] We will

---

[0] Following the district court's disposition of this matter, CalFed assigned its claim to Argo Loan Limited Partnership who was substituted as the named appellant in this matter. For ease of discussion, we will refer to both CalFed and Argo Loan Limited Partnership as CalFed.

[0] The bankruptcy court had jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(1)-(2), which confers

reverse the order of the district court and remand with instructions to return this matter to the bankruptcy court for further proceedings consistent with this opinion.

## I.

Indian Palms Associates, the debtor partnership, was formed to acquire a 176-unit garden apartment complex located in Florida. The debtor purchased that property from Nantucket Investors in 1983, and it is the debtor's primary asset. In 1984 the debtor executed a promissory note of $3.9 million in favor of CalFed, and a mortgage and security agreement to secure payment of the note. Pursuant to the mortgage and note, CalFed also received an assignment of the property's leases, rents, and income.

On December 13, 1990, the debtor filed for relief under Chapter 11 of the Bankruptcy Code, triggering the automatic stay imposed by 11 U.S.C. § 362(a). At that time, CalFed held a first mortgage against the property, which, with accrued interest and late charges, totalled approximately $4.5 million. Nantucket Investors held a second mortgage on the property of approximately $500,000, and a third mortgage was held by FEC Mortgage Company

jurisdiction over core proceedings arising under Title 11, including a motion for relief from the automatic stay. The district court had jurisdiction to entertain an appeal from the bankruptcy court's granting of relief from the stay pursuant to 28 U.S.C. § 158(a). This court has jurisdiction to entertain the instant appeal pursuant to 28 U.S.C. § 158(d) as the district court entered a final order reversing the bankruptcy court's order. CalFed filed a timely notice of appeal following the district court's denial of its motion for rehearing. See Fed. R. App. P. 6(b)(2)(i).

("FEC") in the amount of $1.6 million. FEC was, and remains, an affiliate of the debtor. At the time of the bankruptcy filing, there was also a property tax lien against the property of between $92,000 and $300,000.[0] The parties agree that the tax lien has priority over CalFed's first mortgage. At the time of the bankruptcy filing, the value of the property was between $4.65 and $5.25 million.

During the course of the bankruptcy proceedings, the debtor filed a series of plans of reorganization which were not confirmed. CalFed consented to both the second and third amended plans, but the debtor withdrew the third amended plan when CalFed refused to agree to certain amendments that were necessary to ensure the plan's confirmation. CalFed then moved for relief from the automatic stay under sections 362(d)(1) and (d)(2) of the Bankruptcy Code so that it could institute foreclosure proceedings against the property. In opposition to that motion, the debtor submitted a letter memorandum with a proposed fourth amended plan of reorganization.

The debtor's fourth amended plan proposed the following: (1) the continuance of CalFed's lien on the property in the full amount of its claim with annual interest payments based on an interest rate of 7.75%, plus payments of excess cash flow after the first two years, and a balloon payment for the

---

[0] The debtor's Disclosure Statement of Financial Affairs indicated that the tax liens at the time of the bankruptcy filing were $92,000, but the district court noted that material in the record suggested that tax liens as of the filing date could have been as high as $300,000.

5

remaining mortgage balance five years after confirmation, (2) the payment in full of all real estate taxes and arrearages, (3) an initial $50,000 payment to Nantucket Investors on its second mortgage with various payments to follow, and (4) the infusion of $425,000 in new capital by the debtor's partners for capital improvements on and maintenance of the property.

The bankruptcy court held a hearing on CalFed's motion to vacate the stay. At the hearing, Nantucket Investors joined the debtor in actively opposing the proposed lifting of the stay. The bankruptcy court granted CalFed's motion. In its oral ruling, the bankruptcy court explained that the debtor had failed to show that CalFed's interest in the property was adequately protected because the value of the property had been steadily declining since the bankruptcy petition was filed and the debtor had submitted no evidence to demonstrate that the value would not continue to decline if the stay were not lifted. The bankruptcy court thus found that the lifting of the stay could be granted under section 362(d)(1) which provides that "the court shall grant relief from the [automatic] stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1).

Based on what it understood to be a concession by the debtor, the bankruptcy court determined that the $1.1 million in post-petition payments made by the debtor to CalFed had been interest payments rather than payments on the principal debt. Thus, in reaching the conclusion that CalFed was inadequately protected, the bankruptcy court did not reduce the principal debt

by the amount of these post-petition payments and concluded that CalFed was owed just over $4.5 million. As a result, the debtor's secured indebtedness to CalFed was found to be slightly greater than the property's value at the time of the hearing, which was stipulated to be $4.5 million.

The bankruptcy court's discussion of the liens outstanding against the property led to an implicit finding that the total liens exceeded the current stipulated value of the property and that the debtor therefore had no equity in the property -- a factor supporting relief from the stay under section 362(d)(2). Although the court noted that its resolution of the issues under section 362(d)(1) meant that it need not consider the factors necessary for relief from the stay under section 362(d)(2), the court went on to discuss the second section 362(d)(2) factor -- whether the property is necessary to an effective reorganization. The court concluded that the proposed fourth plan would not be confirmable without CalFed's consent because it improperly extended the original maturity date of CalFed's loan. According to the bankruptcy court, section 362(d)(2) thus provided an alternate basis for granting relief from the automatic stay. The court entered an order lifting the stay and allowing CalFed to institute a foreclosure action against the debtor.

Nantucket Investors appealed to the district court.[0] Thereafter, CalFed filed a motion to strike certain documents

---

[0] The debtor did not participate in that appeal and is not participating in the appeal to this court.

7

that Nantucket Investors had designated as part of the record on appeal.  The district court denied CalFed's motion to strike the documents and reversed the bankruptcy court's order lifting the stay.

With respect to CalFed's motion to strike, the district court concluded that the documents, while not submitted to or reviewed by the bankruptcy court, had all been filed with the bankruptcy court as part of the debtor's Chapter 11 proceeding, and were therefore part of the bankruptcy court record.  The district court found it immaterial whether the bankruptcy court had actually considered any of these documents because they had all been available to the bankruptcy court for its consideration.  As to Nantucket's appeal, the district court found clearly erroneous the bankruptcy court's finding of an agreement among the parties that the post-petition payments of $1.1 million represented interest payments.  First, the district court noted that the debtor had argued to the contrary in the hearing before the bankruptcy court.[0]  Second, the district court determined that of the $1.1 million post-petition payments made by the

---

[0]      Counsel for the debtor had stated that it did not concede that the post-petition payments represented payments of interest, and argued that they were payments on the aggregate debt owed.  App. 326.  However, in its letter memorandum to the bankruptcy court in opposition to CalFed's motion for relief from the stay, the debtor noted that in the proposed fourth plan it elected not to apply the post-petition payments to reduce its outstanding indebtedness to CalFed.  App. 296.  The bankruptcy court apparently understood the debtor's position to be that the post-petition payments were not to be applied against the principal portion of CalFed's lien.  At the hearing, CalFed argued that the payments represented interest or were in the nature of adequate protection payments.  App. 327-28.

8

debtor to CalFed, at least $955,000 should have been attributed to payments on principal rather than interest. Relying on United States Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988), the district court concluded that section 506(b) of the Bankruptcy Code limits post-petition interest to oversecured claims and only to the extent of their oversecurity at the time the bankruptcy petition is filed.[0] Based on the parties's appraisals, the district court estimated that the value of the property at the time of filing was approximately $4.75 million. It further found that CalFed's claim at that time was approximately $4.513 million subordinated to tax liens of $92,000.00.[0] As a result, CalFed was only oversecured by approximately $145,000 and thus, under 11 U.S.C.

---

[0]     The Bankruptcy Code does not speak of secured and unsecured creditors, but of allowed secured and unsecured claims. 11 U.S.C. § 506(a). An allowed claim is secured to the extent the value of the collateral equals the claim. To the extent a claim exceeds the value of the collateral securing it, it becomes an unsecured claim in the bankruptcy case. Thus, an undersecured claim becomes bifurcated under § 506(a) into two claims, one secured and one unsecured. Because the bankruptcy court concluded that CalFed's claim was oversecured, its claim was considered a fully secured claim for purposes of determining the accrual of interest under § 506(b).

[0]     The parties disputed the value of the property on the date the bankruptcy petition was filed. The earliest appraisal presented to the bankruptcy court set the value of the property at $4.65 million as of June 1, 1991. The debtor also had an appraisal showing the value of the property to be $5.2 million as of July 1991, although the debtor indicated that that appraisal had been revised to $4.9 million three months later. App. 330–33. The district court used the compromise figure of $4.75 million to represent the value of the property at the time of filing, and also used $92,000 as the filing date tax lien figure, although the evidence indicated that figure might have been higher. See supra note 3. The court noted that on remand the bankruptcy court was free to make more accurate findings as to the value of the property and the amount of the tax lien on the

§ 506(b), the full $1.1 million in post-petition payments could not have represented payments on interest. Rather, at most, only $145,000 of the post-petition payments were payments of interest. Allocating the balance of these payments to payments on principal left CalFed with a claim of approximately $3.558 million. Comparing this figure to the current value of the property (which for purposes of this motion the parties stipulated to be $4.5 million), less the outstanding value of the senior tax lien ($250,000), left CalFed with a $700,000 "equity cushion." The district court determined that this difference was sufficient to protect CalFed's interest, and held that CalFed was therefore not entitled to relief under section 362(d)(1).

The district court went on to determine whether relief could be granted under section 362(d)(2). The district court rejected the bankruptcy court's implicit comparison between the value of the property and the total liens against the property, and accepted Nantucket Investors's argument that only the difference between CalFed's claim and the property's current value (less the current value of the senior tax lien) should be considered. This left the debtor with an equity interest worth approximately $700,000. The court found this analysis appropriate under the circumstances because both junior lien holders, Nantucket Investors and the debtor's affiliate FEC, opposed the lifting of the stay and were willing to accept under

---

filing date, but concluded that the outcome of its calculations would not change even if figures more generous to CalFed's position were used.

10

the fourth plan of reorganization a drastic impairment of their claims, which the court found had the effect of increasing the debtor's interest in the property.[0] The district court found it equitable under these circumstances to disregard their claims in determining whether the debtor had equity in the property. The district court thus found that the stay could not be lifted under section 362(d)(2).

The district court also reached the issue whether the property was necessary to an effective reorganization, the second prerequisite to the granting of relief under section 362(d)(2). It rejected the bankruptcy court's view that a "cram down" which extended the terms of a mortgage was unreasonable as a matter of law. The district court stated that, if its ruling on the existence of equity were reversed on appeal, the matter should be remanded to the bankruptcy court for a determination as to whether the debtor had proposed an effective reorganization such

---

[0] The debtor and Nantucket testified before the bankruptcy court regarding modifications to the fourth plan to which the creditors had recently agreed. Under the revised fourth plan, Nantucket would get a payment of $50,000 upon confirmation of the plan, and a $150,000 lien which would accrue interest at the rate of 8%, would be paid in full in five years, and would be subordinated to CalFed's claim and the tax lien. The balance of its claim, $350,000, would accrue at 8% and would be subordinated to the debtor's limited partners receiving four times its investment capital of $425,000. App. 342-43. The FEC mortgage, held by the debtor's general partner, would be subordinated to all other claims, including the unsecured claims and the equity interest holders receiving ten times the value of their $425,000 new capital infusion. App. 343. The tax lien, which had been converted to a tax certificate and sold to another party with whom the debtor negotiated a reduction in interest, would be reduced from $300,000 to $250,000 and accrue interest at the negotiated rate of 10% instead of at the former 18% interest rate.

11

that relief under § 362(d)(2) would be foreclosed. The district court entered an order remanding to the bankruptcy court for entry of an order denying CalFed's motion and for further proceedings consistent with its opinion. The "further proceedings" apparently referred to the bankruptcy court's ability to determine the actual amount of the tax liens and the actual value of the property as of the filing date. See supra note 7. CalFed filed a motion for rehearing, which the district court, in an unpublished opinion, denied. CalFed filed a timely appeal and subsequently assigned its claim to Argo Loan Limited Partnership.

## II.

Argo Loan Limited Partnership, as assignee of CalFed's claim, raises three issues on appeal: (1) whether the district court erred in denying CalFed's motion to strike documents not presented to or considered by the bankruptcy court in connection with CalFed's motion to lift the stay; (2) whether the district court erred in determining that the debtor had equity in the property for purposes of 11 U.S.C. § 362(d)(2)(A), and (3) whether the district court exceeded its scope of appellate review by making factual findings with regard to the proper allocation of the $1.1 million post-petition payments. We review the bankruptcy court's factual findings under the clearly erroneous standard. Landon v. Hunt, 977 F.2d 829, 840 (3d Cir. 1992); Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir. 1988). The district court's and the bankruptcy court's legal

12

conclusions are subject to plenary review.  In re Sharon Steel Corp., 871 F.2d 1217 (3d Cir. 1989).

We conclude that CalFed's motion to strike was properly denied because the documents which CalFed sought to strike from the appellate record, having been filed in the bankruptcy case record, were part of the relevant record in this contested matter.  However, we disagree with the district court's application of the standards for determining the debtor's equity in the property and conclude that the debtor did not have equity in the property under the correct legal standard.  We will therefore reverse and remand so that the bankruptcy court may determine whether relief from the automatic stay should be granted under section 362(d)(2).  We also conclude that the district court did not engage in any impermissible factfinding in determining the proper allocation of the post-petition payments, but simply applied the law to the record developed before the bankruptcy court.

III.

In relevant part, the current version[0] of Bankruptcy Rule 8006 provides:

> Within 10 days after filing the notice
> of appeal . . . the appellant shall file with
> the clerk [of the bankruptcy court] and serve
> on the appellee a designation of the items to

---

[0] Subsequent to the district court's disposition of this appeal, Bankruptcy Rule 8006 was amended, but the changes relevant to this appeal were stylistic only.  See Fed. R. Bankr. P. 8006 advisory committee's note (1994 amendment).

> be included in the record on appeal and a statement of the issues to be presented. Within 10 days after the service of the appellant's statement the appellee may file and serve on the appellant a designation of additional items to be included in the record on appeal and, if the appellee has filed a cross appeal, the appellee as cross appellant shall file and serve a statement of the issues to be presented on the cross appeal and a designation of additional items to be included in the record. A cross appellee may, within 10 days of service of the cross appellant's statement, file and serve on the cross appellant a designation of additional items to be included in the record. The record on appeal shall include the items so designated by the parties, the notice of appeal, the judgment, order, or decree appealed from, and any opinion, findings of fact, and conclusions of law of the court.

Fed. R. Bankr. P. 8006 (emphasis added). Pursuant to Bankruptcy Rule 8006, Nantucket Investors designated as part of the record on appeal fourteen documents that CalFed promptly moved to strike. These included the Chapter 11 petition, the debtor's statement of financial affairs and schedules, the debtor's second and third amended plans and disclosure statements, a prior motion of CalFed to lift the automatic stay, and a number of briefs with accompanying certifications that had been filed in the bankruptcy case.

In its motion to strike these documents from the appellate record, CalFed took the position that these fourteen documents could not be properly designated under Rule 8006 because they had not been submitted to the bankruptcy court for its consideration in connection with the instant motion to lift the stay. The district court declined to strike the documents.

14

It subsequently relied upon some of these documents for the purpose of showing the position CalFed took before the bankruptcy court in connection with a prior motion to lift the stay.[0] It did not use any of these documents for any other purpose. Notably, it did not, for example, look to the debtor's statement of affairs and schedules for the purpose of establishing the value of assets at the time of filing. Rather, the district court remanded for the purpose of having the bankruptcy court consider this and other similar matters.

The issue thus presented is whether a party designating the record on appeal under Bankruptcy Rule 8006 can draw only from the record created in connection with the motion that initiated a contested matter[0] or whether that party can draw from the record of the bankruptcy case.

---

[0] This was relevant in the context of a waiver issue. See infra part VI.

[0] Disputes litigated in the bankruptcy court are divided into adversary proceedings and contested matters. Ten types of disputes are designated as adversary proceedings in Bankruptcy Rule 7001. These include most proceedings to recover money or property (including recoveries under the trustee's avoiding powers); proceedings to determine the validity, priority, or extent of a lien; proceedings to determine the dischargeability of a debt; proceedings to revoke a confirmed plan of reorganization; proceedings to determine a claim or cause of action removed to the bankruptcy court; and others. Adversary proceedings are governed by more formal rules of procedure than contested matters and must be instituted by the filing of a complaint. Pursuant to Chapter VII of the Bankruptcy Rules, many of the Federal Rules of Civil Procedure are applicable and these proceedings are thus conducted much like ordinary civil litigation.

Other disputes that arise in connection with the bankruptcy case, including requests for relief from the automatic stay, are contested matters. See Fed. R. Bankr. P. 9014 advisory committee note (1983 adoption) (a contested matter is "an actual dispute, other than an adversary proceeding, before the

15

We have previously held that a bankruptcy judge deciding an adversary proceeding, which is an independent litigation, and an appellate court reviewing that decision, cannot properly use documents filed only in the underlying bankruptcy case unless that use can be justified under the judicial notice doctrine. In re Aughenbaugh, 125 F.2d 887, 889 (3d Cir. 1942).[0] The district court in this case regarded this contested matter to be sufficiently associated with the general administration of the debtor's estate that the relevant record

---

bankruptcy court"). They are generally initiated by motion and do not require a responsive pleading (unless the bankruptcy court directs that an answer be served). Only certain of the rules governing adversary proceedings apply to the resolution of contested matters and the court may direct that these rules will not apply in the litigation of a particular contested matter or that other rules will apply. See Fed. R. Bankr. P. 9014. The procedures governing contested matters are thus less formal.

[0] We held in that case that in determining the issue of insolvency in an action by the trustee to avoid a transfer as a preference, the referee could not rely on the bankruptcy schedules, official appraisals, proofs of claims, and other items on file in the bankruptcy case when they had not been introduced into evidence in the trustee's preference action. In re Aughenbaugh, 125 F.2d at 890. We stated:

> If the trustee desired to rely upon any papers already on file in the bankruptcy proceeding it was incumbent upon him to offer them at the hearing of his exceptions in order that the mortgagee might know that they were being ruled upon and might have an opportunity to meet them with such other evidence as might be available to it.

Id. at 889. We noted further that the doctrine of judicial notice did not provide a basis for the referee's use of the challenged documents in that case. Id. at 890 ("[T]he facts to which [the previously filed documents] related, being disputed in the very controversy under consideration, were not the sort of facts of which the referee was entitled to take judicial notice.").

16

should include the case file as well as the documents submitted in connection with the motion to lift the stay. We, and most of the courts that have heretofore considered the matter, agree. See, e.g., In re Chateaugay Corp., 64 B.R. 990, 995 (S.D.N.Y. 1986); In re T. Michaelis Corvette Supplies, Inc., 14 B.R. 365, 367 (Bankr. N.D. Ohio 1981); Saco Local Dev. Corp. v. Armstrong (In re Saco Local Dev. Corp.), 13 B.R. 226, 229-30 (Bankr. D. Me. 1981).

We hasten to add that the fact that a document is included in the relevant record does not mean that the bankruptcy judge, or the reviewing district court judge, is entitled to use it for any purpose. Just as with documents in the record of a civil action filed in a district court, there are principles that limit its use.

One limitation is the rule that each litigant should be given a fair opportunity to rebut and put into perspective the evidence admitted against its position. It is understood, for example, that the facts relating to the merits of the case will be decided on the basis of evidence admitted into the trial record. Andrews v. Bechtel Power Corp., 780 F.2d 124, 142 (1st Cir. 1985), cert. denied, 476 U.S. 1172 (1986). Thus, for example, an admission of a party previously made in the record should normally be tendered and admitted into evidence at the trial, before the judge in a bench trial can use it to resolve the factual merits of the case.

Another limitation is the rule requiring evidentiary competence. Under this rule, a document cannot be put to a

hearsay use for most purposes, and for this reason, a previously filed court document will generally not be competent evidence of the truth of the matters asserted therein.

Neither of these limitations means, however, that when the course and timing of proceedings, or the positions previously taken by the parties in the case, become relevant for any reason, a trial or appellate judge may not look to any document in the case record to establish the relevant fact. Documents in the case record will be relevant to many issues, including waiver, estoppel, preservation of an issue for appeal, the fact and length of litigation delay, limitations issues, prejudice to an opposing party, and the like. The use of documents in the case record for such purposes does not offend the limitations discussed above because the documents are not being used to determine disputed facts relating to the merits of the case and their use thus does not impose on a party's ability to meet the evidence against it. Similarly, it is not seriously questioned that the filing of documents in the case record provides competent evidence of certain facts -- that a specific document was filed, that a party took a certain position, that certain judicial findings, allegations, or admissions were made. See In re Bestway Prods., 151 B.R. 530, 540-41 (Bankr. E.D. Cal. 1993), aff'd, 165 B.R. 339 (9th Cir. B.A.P. 1994), and aff'd sub nom. In re Wetherbee, 165 B.R. 339 (9th Cir. B.A.P. 1994).

Here the district court properly looked to the record of the underlying bankruptcy case. Documents outside the record developed on CalFed's lift stay motion were used for the sole

18

purpose of determining whether CalFed had waived an argument it sought to make in its motion for reconsideration. This purpose comports with the rules we have discussed.

Even if we were to accept CalFed's view of the limited source from which a party may designate the record under Bankruptcy Rule 8006, however, we could not fault the district court in denying CalFed's motion to strike. Nantucket Investors argues that the doctrine of judicial notice provides an additional basis on which to affirm the district court's denial of CalFed's motion to strike. Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact if that fact is "not subject to reasonable dispute." Fed. R. Evid. 201(b). "Judicial notice may be taken at any stage of the proceeding," Fed. R. Evid. 201(f), including on appeal, id. advisory committee's note (1972 proposed rules), as long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority. Charles Alan Wright & Kenneth W. Graham, 21 Federal Practice and Procedure, § 5110, at 525 (1977); cf. Zell v. Jacoby-Bender, Inc., 542 F.2d 34, 38 (7th Cir. 1976) (refusing to take judicial notice of documents filed in companion case to undermine trial court's findings where to do so would violate rule that appellate court must consider only record before the trial court and exception for "new developments" was not met).

Nantucket Investors' designation of the appellate record can be viewed as a request that the district court take judicial notice of certain portions of the record in the

19

underlying bankruptcy case.  When so viewed, we think the district court's response to CalFed's motion to strike was authorized by Federal Rule of Evidence 201.[0]  See, e.g., Job v. Calder (In re Calder), 907 F.2d 953, 955 n.2 (10th Cir. 1990) (upholding bankruptcy court's taking judicial notice of omissions in debtor's previously filed statement of affairs and schedule of assets as evidence that debtor had made a false oath); In re Strathatos, 163 B.R. 83 (N.D. Tex. 1993) (taking judicial notice of bankruptcy court's findings of facts).

IV.

---

[0] The district court's use of the challenged documents conformed to the standards for judicial notice because the noticed facts were facts not subject to reasonable dispute and CalFed was given an opportunity to be heard.  See Fed. R. Evid. 201(e) (upon request a party must be given an opportunity to be heard regarding both the propriety of taking judicial notice and the "tenor" of the matter noticed).  In light of the fact that the court may take judicial notice of adjudicative facts on its own initiative, the Rule provides that the opportunity to be heard may occur after judicial notice has been taken.  Fed. R. Evid. 201(e); see also id. advisory committee's note (1972 proposed rules) ("No formal scheme of giving notice is provided. An adversely affected party may learn in advance that judicial notice is in contemplation . . . [o]r he may have no advance notice at all.").  CalFed had an opportunity to oppose the propriety of the district court's consideration of these documents, and in fact did so, by filing its motion to strike the documents and by presenting argument in support of that motion to the district court.  Moreover, Nantucket Investors argued in its brief to this court that judicial notice provided an alternative basis on which to affirm the district court's denial of CalFed's motion to strike.  Thus, CalFed had the opportunity to address before us the propriety of the district court's taking judicial notice of these documents.  Accordingly, the failure of the district court to give CalFed an opportunity to oppose the taking of judicial notice is at worst a harmless error.

20

When a debtor files for protection under Chapter 11 of the Bankruptcy Code, section 362(a) provides an automatic stay of most actions against the debtor's property, including actions to realize the value of collateral securing an obligation of the debtor. 11 U.S.C. § 362(a). Because a secured creditor risks losing the benefit of its security interest if it is unable to foreclose against the property, the Bankruptcy Code permits a creditor to seek such relief by filing a motion for relief from the automatic stay under 11 U.S.C. § 362(d). That section provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay . . ., such as by terminating, annulling, modifying, or conditioning such stay--
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if--
>
> > (A)   the debtor does not have an equity in such property; and
> >
> > (B)   such property is not necessary to an effective reorganization.

Section 362(d) is thus intended to balance the interests of the creditors and the debtor.

CalFed sought relief from the automatic stay under both subsections (d)(1) and (d)(2) of section 362(d). We first review

21

the district court's conclusion that the debtor retained equity in the property.  We conclude that the district court committed an error of law.

### A.

The classic test for determining equity under section 362(d)(2) focuses on a comparison between the total liens against the property and the property's current value.  Stewart v. Gurley, 745 F.2d 1194, 1195 (9th Cir. 1984) (citing cases); In re Hanley, 102 B.R. 36, 37 (W.D. Pa. 1989); In re Colonial Ctr., Inc., 156 B.R. 452, 460 (Bankr. E.D. Pa. 1993); La Jolla Mortg. Fund v. Rancho El Cajon Assocs., 18 B.R. 283, 290 (Bankr. S.D. Calif. 1982); State Employee Retirement Fund v. Gardner (In re Gardner), 14 B.R. 455, 456 (Bankr. E.D. Pa. 1981); North East Fed. Savs. & Loan Assoc. v. Mikole Devels., Inc. (In re Mikole Devels., Inc.), 14 B.R. 524, 524 (Bankr. E.D. Pa. 1981).  "All encumbrances are totalled to determine equity whether or not all lienholders have requested relief from the stay."  Nazareth Nat'l Bank & Trust Co. v. Trina-Dee, Inc. (In re Trina-Dee, Inc.), 26 B.R. 152, 154 (Bankr. E.D. Pa. 1983), aff'd, 731 F.2d 170 (3d Cir. 1984).  The district court chose not to apply this formula, finding it appropriate under the circumstances to exclude consideration of the junior secured claims held by Nantucket and FEC.  Nantucket Investors argues that the district court properly excluded the interests of it and FEC because both agreed to compromise their interests in a subordination agreement in order

22

to avoid foreclosure.[0]  We find that the following factors weigh against Nantucket Investors' position: (1) the plain language of section 362(d)(2)(A); (2) the legislative history and policies behind the Bankruptcy Code; and (3) the fact that the Code provides other means by which the interests of junior lienholders may be protected.

B.

The Bankruptcy Code does not define the term "equity" in section 362(d)(2)(A) or in any other section.  Nor does the legislative history shine any direct light on the intended meaning of this term.  When Congress enacted the present-day Bankruptcy Code, however, the generally understood meaning of equity interest was the value of a property above all secured liens.  See Black's Law Dictionary 634 (4th ed. 1968) (defining equity for purposes of real estate transactions as: "The remaining interest belonging to one who has pledged or mortgaged his property, or the surplus of value which may remain after the property has been disposed of for the satisfaction of liens.  The amount or value of a property above the total liens or charges.").  We must assume that Congress was cognizant of this traditional meaning when it enacted section 362(d)(2)(A) without

---

[0]  The treatment of the junior lienholders' claims under the proposed fourth plan is discussed supra note 8.  We do not question the propriety or enforceability of the subordination agreements involving Nantucket Investors' and FEC's claims, 11 U.S.C. § 510(a); we simply reject the argument that the subordination agreements can be used to determine the debtor's equity interest.

a controlling definition. See Walter E. Heller Western, Inc. v. Faires (In re Faires), 34 B.R. 549, 552 (Bankr. W.D. Wash. 1983).

Nantucket Investors argues that the term equity in section 362(d)(2) is ambiguous because equity is accorded a different meaning when the creditor's "equity cushion" is calculated in determining whether the creditor's interest is adequately protected under section 362(d)(1). The text of section 362(d)(1), which governs relief from the automatic stay for good cause including lack of adequate protection, does not contain the term "equity." However, in determining whether a secured creditor's interest is adequately protected, most courts engage in an analysis of the property's "equity cushion" -- the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and all senior claims. See, e.g., In re Colonial Center, Inc., 156 B.R. 452, 459 (Bankr. E.D. Pa. 1993); La Jolla Mortg. Fund v. Rancho El Cajon Assocs., 18 B.R. 283, 289 (Bankr. S.D. Calif. 1982). Junior liens are disregarded for "equity cushion" analysis because the secured creditor is entitled to adequate protection only as to its claim; it may not claim protection for others. La Jolla Mortgage Fund, 18 B.R. at 289. In contrast, all liens are considered in calculating the equity retained by the debtor under section 362(d)(2), because the equity analysis in that section focuses on "the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of all unsecured creditors." Pistole v. Mellor (In re Mellor), 734 F.2d 1396, 1400 n.2 (9th Cir. 1984). Thus, the analysis of the

24

creditor's "equity cushion" under section 362(d)(1) differs from a calculation of the debtor's equity under section 362(d)(2) and does not render the term "equity" ambiguous. E.g., Mellor, 734 F.2d at 1400 n.2 (noting that "equity cushion" differs from "equity" in that the former is concerned with the value of the property above the amount owed to the creditor with a secured claim and the latter is concerned with the value above all secured claims against the property); In re Colonial Ctr., Inc., 156 B.R. 452, 459-60 (Bankr. E.D. Pa. 1993); In re South County Realty, Inc. II, 69 B.R. 611, 614 (Bankr. M.D. Fla. 1987); In re Dunes Casino Hotel, 69 B.R. 784, 793-94 (Bankr. D.N.J. 1986).

C.

We recognize that some bankruptcy courts have rejected the standard definition of equity for purposes of section 362(d)(2) analysis when junior lienholders protest the lifting of the automatic stay to permit foreclosure. See Cote v. United Finance Co. (In re Cote), 27 B.R. 510, 513 (Bankr. D. Or. 1983); Asquino v. Palmer River Realty, Inc. (In re Palmer River Realty, Inc.), 26 B.R. 138, 140 (Bankr. D.R.I. 1983); Central Fla. Prod. Credit Assoc. v. Spring Garden Foliage, Inc. (In re Spring Garden Foliage, Inc.), 15 B.R. 140, 143 (Bankr. M.D. Fla. 1981). Nantucket Investors urges us to adopt that rule, but we decline to do so.

We find no hint in the language or legislative history of section 362(d), and the interests balancing it incorporates, that authorizes excluding the junior lienholders' claims from the equity calculation when their interests diverge from the senior

25

lienholder's.[0]  As the Court of Appeals for the Ninth Circuit has
explained:

> The language of the statute simply refers to
> the debtor's "equity," which has been defined
> as 'the amount or value of a property above
> the total liens or charges.'  The statute
> does not refer to the debtor's equity as
> against the only plaintiff-lienholder seeking
> to lift the stay or persons holding liens
> senior to that of the plaintiff-lienholder.
> The minority view improperly focuses upon the
> interests of junior lienholders . . . .

Stewart v. Gurley, 745 F.2d at 1196 (quoting Walter E. Heller

Western, Inc. v. Faires (In re Faires), 34 B.R. 549, 552 (Bankr.

W.D. Wash. 1983)).

A definition of equity that requires consideration of

all secured liens comports with the purpose of section 362(d)(2)

analysis and strikes the proper balance among the secured

creditors', the unsecured creditors', and the debtor's interests.

The basic purpose behind Chapter 11 of the Bankruptcy Code is to

offer protection to the insolvent debtor who seeks rehabilitation

through a plan of reorganization.  To the extent that property is

of no benefit to the debtor, because the debtor retains no equity

in it and the property is unnecessary to an effective

reorganization, only the junior lienholders will benefit by

---

[0]      To the extent we have located any legislative history
that shines light on this issue, it appears that section
362(d)(2)(A) was intended to protect a creditor's right to
foreclosure.  In a joint explanatory statement prepared by the
floor managers on the ultimately enacted compromise bill, it was
noted that "section [362(d)(2)] is intended to solve the problem
of real property mortgage foreclosures of property where the
bankruptcy petition is filed on the eve of foreclosure."  124
Cong. Rec. H11047, H11092-93; 124 Cong. Rec. S17403, S17409.
Excluding the junior lienholders' claims when they oppose
foreclosure would not further this intent.

26

avoiding foreclosure, at the expense of senior lienholders. See Stewart v. Gurley, 745 F.2d at 1196 ("Unless the debtor can demonstrate that the property is necessary to an effective reorganization, the property is of no value to him. Refusing to grant relief from the automatic stay under those circumstances would only promote the junior lienholders' interests over those of the senior lienholder.").

Furthermore, we note that the language of section 362(d)(2) is mandatory, when both factors necessary for relief under section 362(d)(2) are met "the court shall grant relief." 11 U.S.C. § 362(d)(2). Excluding the claims of objecting junior lienholders from the equity calculation when the subsection (d)(2) factors are otherwise met would thus contravene the plain language of that provision.

D.

Our refusal to adopt Nantucket Investors' position does not prevent the bankruptcy court from otherwise considering the interests of objecting junior lienholders. On the contrary, when a senior lienholder successfully petitions the bankruptcy court for relief from the automatic stay in order to proceed with a foreclosure action, junior lienholders may protect their interests by bidding at foreclosure in order to retain their secured interest in the property. Additionally, it is appropriate for the bankruptcy court to consider the interests of junior lienholders in determining whether an effective

27

reorganization is possible without the encumbered property.  See In re Mellor, 734 F.2d at 1401; 2 Collier on Bankruptcy, § 362.07[2], at 362-69 & n.15a (Lawrence P. King ed., 15th ed. 1994).  Thus for example, in this case the bankruptcy court may properly consider the junior lienholders' subordination agreements in determining whether an effective reorganization is possible and whether the property is necessary to that end.  Because we find that there are other means by which the bankruptcy court may consider the interests of junior lienholders in determining whether relief from the automatic stay is proper, we find no need to adopt a changeable definition of equity that excludes consideration of protesting junior lienholders' interests under certain circumstances.[0]

We will therefore reverse the district court insofar as it determined that the debtor has equity in the property, and will remand with instructions to return this matter to the bankruptcy court so that it may consider the second factor necessary for relief under section 362(d)(2), namely whether the property is necessary to an effective reorganization.[0]

---

[0]     We reject Nantucket Investors' argument that its willingness to cede a portion of its secured claim to the debtor to defeat lifting of the stay under § 362(d)(2) should be considered in calculating the debtor's equity.  Nantucket Investors has not in fact ceded any portion of its claim to the debtor and we will not accept its willingness to do so as the equivalent.

[0]     Under the proper equity calculation, the outstanding liens against the property exceed the current stipulated value of the property and the debtor thus retains no equity in the property.

A final note regarding relief under § 362(d)(2) is necessary in light of our remand order. In a single-asset bankruptcy case like this one, the property will almost always be necessary for reorganization for the very reason that it is the debtor's sole asset, and relief under 362(d)(2)(B) will be available only if the bankruptcy court concludes that reorganization within a reasonable time is not feasible. See United Savings Ass'n v. Timbers of Inwood Forest, 484 U.S. at 376 (noting that the requirement that the property be "necessary to an effective reorganization" requires a showing that there is "a reasonable possibility of a successful reorganization within a reasonable time" (internal quotation omitted)); Ahlers v. Norwest Bank Worthington (In re Ahlers), 794 F.2d 388 (8th Cir. 1986), rev'd on other grounds, 485 U.S. 197 (1988). The bankruptcy court found that the debtor's fourth plan would not be confirmable under the Bankruptcy Code's cram down procedure,[0] because it extended the maturity date of CalFed's mortgage beyond its original term. The district rejected the bankruptcy court's conclusion that there was any such per se rule. We agree. As the district court noted, the plain terms of the Bankruptcy Code refute the proposition that a plan may not extend the maturity date of a mortgage. See 11 U.S.C.

---

[0] Where the debtor cannot secure the acceptance of all classes of impaired claims, the Bankruptcy Code permits the confirmation of a plan over the objections of impaired classes under certain conditions through a procedure known as a cram down. 11 U.S.C. § 1129(a)(10), (b).

29

§ 1123(a)(5) ("[A] plan [of reorganization] shall . . . provide adequate means for the plan's implementation, such as . . . modification of any lien; . . . extension of a maturity date or a change in an interest rate or other term of outstanding securities."). There is no per se rule that a nonconsensual plan may not extend a secured lien beyond its original mortgage date. In re Crane Automotive, Inc., 88 B.R. 81, 83 (Bankr. W.D. Pa. 1988); In re Martin, 66 B.R. 921, 930 (Bankr. D. Mont. 1986); In re Hollanger, 15 B.R. 35, 46-47 (Bankr. W.D. La. 1981). Therefore on considering whether relief from the stay is warranted under section 362(d)(2), the bankruptcy court may not find that reorganization is precluded as a matter of law solely because a proposed plan extends the maturity date on CalFed's mortgage.

## VI.

As noted, CalFed also sought relief from the automatic stay under section 362(d)(1) on the ground its claim was not adequately protected. The bankruptcy court granted relief on this ground and the district court reversed. On appeal, CalFed maintains that the district court engaged in impermissible fact finding in determining that the current value of its claim is less than the current stipulated value of the property, and that its claim is adequately protected by the remaining "equity cushion."[0]

---

[0] Under 28 U.S.C. § 158(a), the district court sits as an appellate court and is not authorized to engage in independent fact finding. Indeed, under the appropriate standards of review,

30

Central to the determination of adequate protection in this case is the proper allocation of approximately $1.1 million in post-petition payments made by the debtor to CalFed. Although the bankruptcy court did not make a specific finding regarding the allocation of the post-petition payments, in finding that the current value of CalFed's claim was approximately $4.5 million (the same as the value of its claim when the bankruptcy petition was filed), the bankruptcy court must have allocated all of the post-petition payments to interest rather than to payments reducing the underlying debt.[0] The district court, relying on the evidence adduced during the bankruptcy hearing, concluded that such an allocation was improper as a matter of law since, under the guiding legal principles, interest can accrue post-petition only to the extent that a creditor's secured claim exceeds the value of the property securing it. See 11 U.S.C. § 506(b); Timbers, 384 U.S. at 372-73. Thus, the district court concluded that because, as of the petition date, CalFed's claim exceeded the estimated value petition date value of the property (less the estimated value of the tax lien) by only approximately $145,000, the bulk of the post-petition payments had to be allocated to payments on the principal debt, reducing the current value of CalFed's claim to a figure approximately $700,000 less than the current stipulated value of the property, and leaving

---

the district court reviews the bankruptcy court's findings in a core proceeding only for clear error. Fed. R. Bankr. P. 8013.

[0] The basis for the bankruptcy court's conclusion that CalFed's claim had not been reduced by the $1.1 million post-petition payments is not entirely clear. See supra note 5.

CalFed's claim adequately protected against further erosion in the value of the property. CalFed maintains that after determining that the debtor and Nantucket Investors had not conceded that interest had accrued post-petition to the full extent of the post-petition payments, the district court should have remanded the issue to the bankruptcy court so that it could consider all relevant factors pertaining to the allocation of the post-petition payments, and could then determine the actual value of CalFed's current claim and whether its claim was adequately protected.

The heart of CalFed's argument is that one relevant factor that the bankruptcy and district courts have not yet considered is whether the assignment of rents gave CalFed a lien on the property's rental income when the bankruptcy petition was filed. CalFed maintains that if it had such an interest, the value of the collateral securing its claim would have been the sum of the petition date value of the property plus the present value of the future rental income, and that its claim would have been "oversecured" by an amount greater than the $145,000 figure used by the district court to determine under Timbers how much post-petition interest could have accrued. CalFed asserts that the district court's determination that the current stipulated value of the property exceeds the value of CalFed's current claim by nearly $700,000, and its conclusion that CalFed was thus adequately protected, therefore rested on an incomplete set of facts. We disagree.

32

In the papers accompanying its motion for relief from the stay, CalFed asserted that its claim on the date the bankruptcy petition was filed was approximately $4.5 million, and that since the petition date, the amount outstanding under the note and mortgage had grown by approximately $1.59 million, including approximately $1.49 million in post-petition interest. App. 6 (declaration of bank vice-president). However, neither in its moving papers nor its accompanying brief did CalFed assert a legal basis for the accrual of this much post-petition interest.[0]

The allocation of the post-petition payments became a contested issue at the hearing before the bankruptcy court. Indeed, the bankruptcy court noted that the proper allocation of these payments would likely determine whether CalFed's interest was adequately protected. As the hearing transcript demonstrates, however, the parties presented only two theories that would support the allocation of post-petition payments to something other than a reduction of the principal debt: CalFed's unsupported assertion that the payments may have been in the nature of adequate protection payments,[0] and the debtor's contention that interest could have accrued post-petition only to the extent that CalFed's claim exceeded the value of the property

---

[0] CalFed's lack of adequate protection argument rested on the property's decline in value since the bankruptcy filing and the debtor's failure to propose a confirmable plan since that time.

[0] See 11 U.S.C. § 361(1).

as of the petition date, less the petition date value of the tax lien.[0]

---

[0] Mr. Kitzel argued on behalf of CalFed. Mr. Bauer represented the debtor and Mr. Higgens represented Nantucket Investors.

THE COURT: Does the Debtor concede that interest accrued during the [Chapter] 11 or not?

MR. BAUER: No, your Honor. We do not concede. . . .

. . . .

THE COURT: One of the dispositive issues is going to be the amount of the short-fall. And so, therefore, we need to peg a value, and we need to peg what your pay-off figure is.

I mean, the Debtor made substantial payments in the [Chapter] 11 of over a million dollars. The question is, was there, also, the post-petition interest accrual of a million four [as CalFed asserted in the declaration of bank vice president Koehler which accompanied its motion].

. . . If interest continued to accrue, your debt increased by a half million.

If interest didn't accrue, and the Debtor tendered over a million dollars in payments, your balance [owing to CalFed] may be . . . substantially less than what it was when you filed. So, I mean, it becomes very critical as to whether interest continued to accrue or not under the Timbers case.

MR. KITZEL: Your Honor, the payment of the million dollars also is in the form of adequate protection payments. So it is not necessarily interest.

34

. . .I believe that that's the reason why --
the value of the property was decreasing, the
payments . . . were made.

     THE COURT:  Well, what shows that in the
record?  Is there an order that memorializes
that?

     MR. BAUER:  There is no cash collateral
order.  There's nothing that says that it was
adequate protection payment.  We paid them a
million dollars during the course of this
case, in excess of a million.  That should be
implied [sic] to the aggregate indebtedness
owing to CalFed. . . . There is nothing that
states it should be applied to interest.

     . . . .

     THE COURT:  Wait.  What does CalFed say
the property was worth on the day the Chapter
11 was filed?  Isn't that what <u>Timbers</u> tells
us?  We have to look and see if you were over
collateralized or under collateralized on the
date of the filing to determine whether
interest accrues or not; right?

App. 326-29.

     Following a discussion of the evidence regarding the
value of the property as of the petition filing date the debtor
conceded that the value of the property at that time was "in the
ballpark" of $4.5 to $4.6 million.  App. 333.  CalFed had
previously asserted that its claim on the petition date was
approximately $4.5 million.  App. 331.  The discussion of the
accrual of post-petition interest continued:

     THE COURT:  All right.  So, therefore,
interest accrued; right?. . . .

     MR. BAUER:  Only to the value of the
property it could have accrued to.

     It couldn't accrue in excess of the
value of the property. . . .

     . . . .

35

Significantly, neither before the bankruptcy court nor in response to Nantucket Investors' appeal to the district court did CalFed raise its potential interest in the rental stream to explain how interest could have accrued beyond the extent of CalFed's facial oversecurity.  CalFed presented this argument for the first time in connection with its motion for relief from the stay when it sought reconsideration from the district court following that court's reversal of the bankruptcy court's conclusion that CalFed was not adequately protected.[0]  On appeal to this court, it maintains that "[t]he rental income stream was the source of the post-petition payments." Appellant's Amended Brief at 35.  However, for purposes of its motion for relief from the stay, CalFed has posited its rental stream theory too late.

---

> There's also another piece of this puzzle that's missing, and that is, at the outset of this case, when it was filed, there were tax arrearages of approximately $300,000.
>
> . . . .
>
> If we're looking to see what they're entitled to by way of accruing interest, then that $300,000, which was a jump-ahead lien, has to be factored into the scenario.

App. 333-34.  CalFed responded by arguing that a recent letter from the debtor to the bank's representative admitting that the property "has greatly deteriorated over the past few years" established a prima facie case that CalFed's interest was not adequately protected.  App. 335-37.

[0]  CalFed had asserted an interest in the rental income in a 1991 motion in which it sought relief from the automatic stay and to prohibit the debtor from using cash collateral in the form of rents, which motion it withdrew upon consenting to the debtor's second proposed plan of reorganization.

"Ordinarily, an appeals court will not consider issues not raised in the court below."[0] Trailways Lines, Inc. v. Trailways, Inc. Joint Council of Amalgamated Transit Union, 785 F.2d 101, 104 n.2 (3d Cir.), cert. denied, 479 U.s. 932 (1986). Having failed to raise its rental stream theory as a basis for allocating the post-petition payments to interest payments during the fact finding hearing before the bankruptcy court, CalFed has waived the argument that it has a lien on the rental income of the property for purposes of this motion for relief from the automatic stay. CalFed is therefore precluded from submitting new evidence on remand to establish the petition date value of its claim, other than within the parameters set forth by the district court.[0] Whether CalFed will be estopped from asserting an interest in the rental stream during other proceedings in this Chapter 11 case will depend on the application of principles of res judicata, collateral estoppel, and law of the case as they

---

[0] Although an exception to this rule permits appellate review of an issue not raised in the trial court to serve the interests of justice, Trailways Lines, Inc., 785 F.2d at 104 n.2, the grounds for this exception are not met in this case.

[0] The district court carefully noted that certain relevant facts were not definitively established by the evidence before the bankruptcy court, including the petition date value of the tax lien and the petition date value of the property. Thus, the district court noted that on remand, the bankruptcy court could calculate these actual values in determining the precise amount of CalFed's "equity cushion." However, in light of the range in which these values would fall (based on the record evidence before it) the district court noted that the precise calculations would not have a legal effect on its conclusion that CalFed's claim was adequately protected by a significant equity cushion.

apply in bankruptcy proceedings.[0] We express no view on that issue. The only issue currently before us is the effect CalFed's failure to raise its interest in the rental income has on the disposition of its present motion to lift the automatic stay.

The district court did not engage in independent fact finding. The court simply applied the law -- that interest can accrue post-petition only to the extent the value of the collateral securing a creditor's claim exceeds the petition date value of its claim -- to the record developed before the bankruptcy court. The only disputed facts regarding the allocation of the post-petition payments concerned the actual petition date value of the property and the actual petition date value of the tax lien, facts that the district court properly declined to ascertain.

## VII.

We reverse the district court's determination that the debtor has equity in the property within the meaning of section 362(d)(2)(A) and remand with instructions to return this matter to the bankruptcy court so that it may determine whether the property is necessary to an effective reorganization, and thus whether relief from the automatic stay may be granted under section 362(d)(2). We affirm the district court's order in all other respects.

---

[0] See generally Hon. Barry Russell, Bankruptcy Evidence Manual, §§ 1-40 (1994).

------------------------------------------------------------------

ROTH, Circuit Judge, concurring in part and dissent
ing in part.

        Although I concur with the majority in Parts I-III, V
and VI of their opinion, I cannot agree with their conclusion in
Part IV that the debtor did not retain equity in the property.  I
must therefore respectfully dissent from the reversal of the
district court's determination in that regard.

        The majority adopts the "classic test" for determining
equity under § 362(d)(2):  subtracting the value of all the
secured liens on the property from the property's current value.
They reject the district court's exclusion  of the junior secured
claims of Nantucket and FEC from the subtrahend of the
calculation.  However, if junior lienholders are willing to
concede their secured position in such a way that the senior
lienholder's interest is protected, the debtor may have actual,
if not literal, equity in the property.  I see no reason why that
concession should not be permitted and "equity" be defined in a
reorganization by the balance, reached by subtracting the
security of concerned lienholders from the value of the property,

rather than from a calculation of figures that do not represent the reality of the commercial situation.

Nantucket urges the court to adopt the district court's reasoning that, pursuant to the Fourth Amended Plan, the junior lienholders effectively granted the Debtor a portion of their equity in the Property by subordinating part of their secured claims. I agree that such an interpretation of "equity" is reasonable and could permit a Chapter 11 reorganization to succeed in a situation where the junior lienholders were willing to step back, at least in part, from their secured positions. For example, in a single asset reorganization, junior lienholders may face the eradication of their interest in the debtor's property if a plan of reorganization cannot be developed. Their willingness to cooperate to save their own interest may be the factor which will permit the reorganization to succeed.

Adherents of the majority's interpretation of "equity" have criticized the subtraction of the amounts owed to junior lienholders from a determination of equity as "improperly focus[ing] upon the interests of junior lienholders as opposed to the interests of the debtor or senior lienholder." Stewart v. Gurley, 745 F.2d 1194, 1196 (9th Cir. 1984). The concern is that the interests of the junior lienholders will be promoted over those of the senior lienholder. Id. However, if the property is necessary to the reorganization and if the senior lienholder is adequately protected, it makes very good sense to me in a §362(d)(2)(A) calculation to credit the interests of the junior lienholders to equity. I would urge that we do so.

40

In the present case, the district court found that if it were to uphold the bankruptcy court's grant of a stay, "the claims of both the Debtor and its affiliate FEC, along with the objecting lienholder Nantucket and all of the unsecured creditors [would] be wiped out."  In re:  Indian Palms Associates, Ltd. No. 93-4519, slip op. at 13 (D.N.J. Feb. 8, 1994).  That consequence surely accounts for Nantucket and FEC's concessions in the Fourth Amended Plan.  If the junior lienholders are willing to make concessions, I can see no reason why they should not be permitted to subordinate or restructure their liens so that the senior lienholder is protected and the reorganization may then go through.

Moreover, as the district court stated, by recognizing the junior lienholders' concessions and finding that they gave the debtor equity in the property, the court would further "the objectives of the Bankruptcy Code of both preserving the liens of the secured creditors and, to the extent feasible, adopting plans which will protect the interests of junior lienholders, unsecured creditors and equity holders."  Id. at 15.

Although they are in the minority, other courts have seen the logic of calculating "equity" without deducting the liens of junior lienholders who are willing to cooperate with the debtor.  See, e.g., In re Palmer River Realty, Inc., 26 B.R. 138, 139-40 (Bankr. D.R.I. 1983) (in calculating equity under §362(d)(2)(A), second mortgage had no relevance to question of equity where second mortgagee expressed desire to support reorganization attempt; "second mortgage should not be considered

3

in determining whether there is an equity cushion in the subject property.").

The majority also cites as a reason for adopting its construction of § 362(d) the "mandatory" language of the section: "the court shall grant relief from the stay". [Typescript at 27] Inherent in this reading of the statute is the interpretation of "equity" in the "classic" manner as was done by the majority. If, however, we were to interpret "equity" as we suggest above, the elements of subsection (d)(2)(A) might not be satisfied and the mandatory language would not then be triggered.

Moreover, the majority stops its reading of § 362(d) too soon.  The section goes on to provide that the form of relief granted may be "such as by terminating, annulling, modifying, or conditioning such stay--".  The fact that the relief requested of the bankruptcy court is termination does not preclude the court from granting other relief:  for example, relief which will condition the continuation of the stay on concessions by the junior lienholders.  A leading bankruptcy commentator agrees that this statutory language should be construed flexibly:

> The flexibility of section 362 is underscored by the language of subsection (d) which provides that relief may be granted by "terminating, annulling, modifying, or conditioning" the stay.  The effect is to permit the court to fashion the relief to the particular circumstances of the case.  Thus modification or conditioning of the stay may be sufficient to protect the non debtor party by permitting the exercise of certain but not all of its rights.

2 Collier on Bankruptcy, § 362.07, at 362-64 (Lawrence P. King ed., 15th ed. 1994).

4

Finally, the majority comments that the junior lienholders here may be protected by demonstrating to the bankruptcy court that the property is necessary to an effective reorganization.  I am unwilling, however, to rely on this element of subsection (d)(2)(B) for ensuring a remedy for a junior lienholder, such as Nantucket.  There is the possibility for too much interplay between subsections (A) and (B) of § 362(d)(2).  I can envision a scenario in which consideration of the requirements of subsections (A) and (B) are conflated into one exercise:  the bankruptcy court finds a reorganization would not be possible because of the debtor's lack of classically construed "equity" in the property and decides to grant relief from the stay; the bankruptcy court would not then go on, as the majority discusses here, to consider whether the property was necessary for an effective reorganization and subsection (B) would not be available, in what might otherwise be a successful reorganization, to protect the interests of the junior lienholders.

For all the above reasons, I conclude that the language of § 362(d)(2) does not require the majority's "classic" interpretation of equity.  I am persuaded instead that the interests of the Bankruptcy Code in protecting all lienholders should permit junior lienholders to concede their security in order to create equity for the debtor and to permit a reorganization to go forward where, lacking that concession, it would not.