**Opinions of the United States Court of Appeals for the Third Circuit**



11-24-1998

# Citicorp Venture Cap v. Comm Creditors

Precedential or Non-Precedential:

Docket 97-3518,97-3519

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Citicorp Venture Cap v. Comm Creditors" (1998). *1998 Decisions*. Paper 268.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/268

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 24, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 97-3518 and No. 97-3519

CITICORP VENTURE CAPITAL, LTD.,
a New York Corporation

v.

COMMITTEE OF CREDITORS HOLDING UNSECURED
CLAIMS, AND COMMITTEE OF CREDITORS HOLDING
UNSECURED CLAIMS AS ESTATE REPRESENTATIVE OF
PAPERCRAFT CORPORATION
(D.C. Civil No. 95-cv-01872)

COMMITTEE OF CREDITORS HOLDING UNSECURED
CLAIMS, AND COMMITTEE OF CREDITORS HOLDING
UNSECURED CLAIMS AS ESTATE REPRESENTATIVE OF
PAPERCRAFT CORPORATION

v.

CITICORP VENTURE CAPITAL LTD.,
a New York Corporation
(D.C. Civil No. 95-cv-01886)

         COMMITTEE OF CREDITORS HOLDING
         UNSECURED CLAIMS, AND COMMITTEE OF
         CREDITORS HOLDING UNSECURED CLAIMS AS
         ESTATE REPRESENTATIVE OF PAPERCRAFT
         CORPORATION,
         Appellant in No. 97-3518

CITICORP VENTURE CAPITAL, LTD.,
a New York Corporation

v.

COMMITTEE OF CREDITORS HOLDING UNSECURED
CLAIMS, AND COMMITTEE OF CREDITORS HOLDING
UNSECURED CLAIMS AS ESTATE REPRESENTATIVE OF
PAPERCRAFT CORPORATION
(D.C. Civil No. 95-cv-01872)

COMMITTEE OF CREDITORS HOLDING UNSECURED
CLAIMS, AND COMMITTEE OF CREDITORS HOLDING
UNSECURED CLAIMS AS ESTATE REPRESENTATIVE OF
PAPERCRAFT CORPORATION

v.

CITICORP VENTURE CAPITAL LTD.,
a New York Corporation
(D.C. Civil No. 95-cv-01886)

        CITICORP VENTURE CAPITAL, LTD.
        Appellant in No. 97-3519

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civil Action Nos. 95-cv-01872 and 95-cv-01886)

Argued July 21, 1998

BEFORE: STAPLETON and ROSENN, Circuit Judges,
and RESTANI,* Judge

(Opinion Filed November 24, 1998)
_____

*Hon. Jane A. Restani, Judge of the United States Court of International
Trade, sitting by designation.

2

Amy M. Tonti
Klett, Lieber, Rooney & Schorling
One Oxford Centre, 40th Floor
Pittsburgh, PA 15219
 and
Paul K. Vey
Pietragallo, Bosick & Gordon
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
 and
Lawrence J. Slattery (Argued)
Citibank Legal Affairs Office
425 Park Avenue, 3rd Floor
New York, NY 10043

 Attorneys for
 Citicorp Venture Capital, Ltd.
 Appellant in No. 97-3519

Philip E. Beard
Stonecipher, Cunningham, Beard &
 Schmitt
125 First Avenue
Pittsburgh, PA 15222
 and
Stephen M. Ray (Argued)
Stutman, Treister & Glatt
3699 Wilshire Boulevard
Suite 900
Los Angeles, CA 90010
 Attorneys for Committee of
 Creditors Holding Unsecured
 Claims and Committee of Creditors
 Holding Unsecured Claims as
 Estate Representative of Papercraft
 Corporation, Appellant in No.
 97-3518

3

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This appeal is from a decision in an adversary proceeding brought by plaintiff-appellant/cross-appellee Committee of Creditors Holding Unsecured Claims (the "Committee") against defendant-appellee/cross-appellant Citicorp Venture Capital, Ltd. ("CVC"). The action arises out of the chapter 11 reorganization of Papercraft Corporationfiled in the Western District of Pennsylvania. The Committee claims that CVC, while a fiduciary of Papercraft, secretly purchased millions of dollars of claims against Papercraft at a discount, seeking to control Papercraft's assets and make a profit at the expense of Papercraft's other creditors. CVC contends that the claims were properly purchased and that it acted in the best interests of both the company and its creditors. After a trial, the bankruptcy court entered a judgment against CVC, allowing CVC's purchased claims only to the extent of the discounted amount CVC paid for them and limiting its recovery to the percentage distribution provided in the plan multiplied by that discounted amount. On appeal, the district court agreed with the bankruptcy court's finding that CVC had breached its fiduciary duties, acted inequitably, and caused injury to Papercraft and its creditors. It disagreed, however, with the bankruptcy court's chosen remedy and remanded for a redetermination regarding the appropriate remedial action. This appeal followed.

I. THE FACTS FOUND BY THE BANKRUPTCY COURT*

In 1985, Papercraft completed a leveraged buyout in which CVC invested $5.8 million. As a result of this transaction, CVC was given a 28% equity interest in Papercraft's direct parent, Amalgamated Investment Corp., and the right to seat one representative on the boards of directors of Amalgamated, Papercraft, and Papercraft's wholly-owned operating subsidiaries, Barth & Dreyfuss of California and Knomark, Inc. CVC's vice president, M. Saleem Muqaddam, became CVC's representative on these

4

boards of directors, and he remained such during the time period relevant to this appeal.

Papercraft ran into financial difficulties a few years after the transaction, which forced a restructuring of the leveraged buyout ("LBO") debt. As part of the restructuring, Papercraft exchanged about 98% of its indebtedness for new First Priority Notes and Second Priority Notes. However, beginning in 1990, Papercraft was unable to meet the terms of the notes and sought to negotiate a second restructuring of its unsecured debt. An informal committee of major Papercraft creditors was formed and, after several months of negotiations, an agreement was reached on a restructuring plan. The plan, known as the "BDK plan," called for a merger of Papercraft's operating subsidiaries (Barth & Dreyfuss and Knomark) into a single entity, BDK Holdings, Inc., as part of a voluntary chapter 11 petition to be filed by Papercraft. The creditors' claims against Papercraft would then be converted into "BDK Units" consisting of stock and bonds issued by the new venture. The BDK plan was approved unanimously by Papercraft's directors, including CVC's Muqaddam, in March 1991.

Papercraft filed its voluntary petition under chapter 11 on March 22, 1991. As of the filing date, Papercraft had outstanding $90.7 million in First Priority Notes and $56.3 million in Second Priority Notes, none of which were held by CVC. Pursuant to the agreement among the creditors, Papercraft filed the BDK plan with the chapter 11 petition and an official Committee was formed to represent the interests of unsecured creditors.

Though the chapter 11 petition and BDK plan werefiled in March 1991, the required Papercraft disclosure statement, a prerequisite to confirmation of the plan, was not filed until October 1991. During this delay, CVC managed to purchase over 40% of the outstanding notes, at a significant discount. CVC, despite its earlier support of the BDK plan, then objected to the confirmation of that plan and offered its own competing plan, which called for a CVC purchase of Papercraft's assets. An account of the specific circumstances under which CVC took these actions follows.

In March 1991, Muqaddam, in a memorandum to CVC's Investment Committee, sought authorization to spend up to $10 million purchasing Papercraft notes. CVC officials granted the request in April 1991. Muqaddam, acting for CVC, then began making anonymous purchases of notes through various brokers. Between April and August 1991, CVC purchased $60,849,575.72 face value of the Papercraft notes for $10,553,541.88. These purchases represented a significant proportion of the outstanding Papercraft debt: CVC managed to acquire 38.3% of Papercraft's outstanding First Priority Notes and 46.4% of outstanding Second Priority Notes. In all, CVC's purchases amounted to 40.8% of Papercraft's total unsecured claims. It thus achieved a "blocking" position in the proposed reorganization. Although Muqaddam was a member of Papercraft's board, and therefore a fiduciary to the company and its creditors, neither he nor anyone else from CVC requested or obtained the approval of the board, the Committee, or the court before purchasing the notes. Nor did CVC disclose to any of the selling creditors its identity as buyer or itsfiduciary status.

At the same time CVC was surreptitiously purchasing claims, it also requested or otherwise obtained confidential information about Papercraft's financial stability and assets, including information that was not shared with Papercraft's other creditors. In early 1991, at Muqaddam's direction, two CVC employees visited the headquarters of Papercraft's Barth & Dreyfuss subsidiary to obtain information. During that visit, CVC copied financial statements, looked at the company's product lines, held meetings with management, and toured the facilities. A written report was subsequently completed by CVC, drafts of which were shared with Papercraft personnel. Indeed, Frank Kane, Papercraft's Chief Financial Officer, reviewed the report and gave comments directly to Muqaddam. None of this information was shared with the Committee. Papercraft personnel also forwarded a number offinancial analyses and other documents directly to CVC, including a tax analysis that had been completed by a consultingfirm at Muqaddam's request. In addition, a valuation of Papercraft assets and a distressed sale analysis completed

6

by Chanin and Company, the Committee's own financial advisor, was given to CVC by Papercraft personnel.

As CVC accumulated Papercraft debt and information between April and August 1991, it also formulated a reorganization plan designed to compete with the previously filed BDK plan. Muqaddam and his staff prepared a series of reports evaluating the possibility of a CVC asset purchase offer. These reports were based, in large part, on the information about Papercraft that had been forwarded to CVC by Kane. In the course of preparing an asset purchase offer, Muqaddam held a meeting with Kane and the Bank of New York Credit Corporation ("BNYCC") to discuss financing for a CVC asset purchase offer. Muqaddam then prepared a memorandum to CVC's Investment Committee requesting authorization to purchase Papercraft's assets. This authority was granted to Muqaddam in August 1991.

In early September 1991, CVC formalized an asset purchase offer by sending a letter to Papercraft detailing the plan and announcing a financing arrangement with BNYCC. Shortly before this announcement, Muqaddam informed the Committee, for the first time, that CVC had been purchasing claims. Soon after the asset purchase offer was announced, it was filed as a plan of reorganization by Papercraft. Papercraft also filed disclosure statements for both the BDK plan and the CVC plan in October 1991.

The BDK plan disclosure statement was approved by the bankruptcy court at a hearing in December 1991. Shortly thereafter, CVC withdrew its plan of reorganization, but then filed objections to confirmation of the BDK plan. The bankruptcy court overruled those objections and confirmed the BDK plan in January 1992.

II. THE PRIOR PROCEEDINGS

In October 1991, the Committee initiated this adversary proceeding against CVC, objecting to the allowance of the claims CVC had purchased and seeking equitable subordination of those claims. After extensive discovery, a trial was held over two days in November 1994. After reviewing the testimony and evidence, the bankruptcy court

ruled in favor of the Committee. The court held that CVC had failed to meet its fiduciary obligation to act in the best interest of Papercraft and its creditors. See In re Papercraft Corp., 187 B.R. 486, 497 (Bankr. W.D. Pa. 1995). It identified three adverse effects from CVC's breaches of its fiduciary duty. First, the bankruptcy court noted that the note holders who sold their claims to CVC "were deprived of the ability to make a fully informed decision concerning the sale of their claims." Id. Although they might have still decided to sell after full disclosure, "[t]he harm lies in the fact that the selling noteholders had no opportunity to consider pertinent information." Id.

Second, the court concluded that "CVC's actions diluted the voting rights of prepetition creditors and resulted in CVC's attempt to wrest from the prepetition creditors the valuable assets of [Papercraft]." Id. Though CVC did not ultimately vote its claims, the court concluded that "[n]onetheless, its acquisition of claims placed it in the controlling seat in its class," id. at 499 n. 10, and that CVC was able to influence the negotiations surrounding the terms of the plan despite its ultimate election not to vote.

Finally, the bankruptcy court decided that CVC's actions created a conflict of interest which jeopardized its ability "to make future decisions on claims as a director free of [its] own personal interests as [an] owner of claims. Adding to the conflict is the fact that these purchases were made at a discount from present value. This brings into play a profit motive, accentuating [its] personal interests." Id. at 500 (quoting In re Cumberland Farms, Inc., 181 B.R. 678, 680 (Bankr. D. Mass. 1995)).

To remedy the adverse consequences of CVC's behavior, the bankruptcy court applied a "per se rule" that when a claim is purchased by an insider at a discount without adequate disclosure to the debtor and creditors, "the insider's newly acquired claim will be limited to the amount paid by the acquiring insider and recovery on the claim will be limited to the percentage distribution provided in the plan, as applied to the allowed claim." Id. at 491. However, the bankruptcy court declined to equitably subordinate CVC's claims.

8

On appeal, the district court first reviewed the findings of fact made by the bankruptcy court and found none of them clearly erroneous. Applying the facts to the test for equitable subordination, the district court agreed that CVC had acted inequitably and that this behavior had injured creditors. As for a remedy, the district court held that CVC's recovery should, at a minimum, be limited to the amount paid for its claims so as to eliminate any potential profits from the purchase of the notes. It disapproved of the bankruptcy court's per se rule, however, and remanded to the bankruptcy court for a determination of "the amount CVC's claims should be subordinated." Id.1

III. THE RIGHT TO RELIEF

Before ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code. U.S. v. Noland, 116 S. Ct. 1524 (1996) (describing existing case law as consistent with the three part test identified in In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977)).2

---

1. The bankruptcy court had jurisdiction over this adversary proceeding pursuant to 28 U.S.C. SS 157(b) & 1334(b). The district court had appellate jurisdiction over the bankruptcy court'sfinal judgment pursuant to 28 U.S.C. S 158(a)(1). We have jurisdiction over the final decision of the district court pursuant to 28 U.S.C.S 158(d). See In re Indian Palms Associates, Ltd., 61 F.3d 197, 199 n. 2 (3d Cir. 1995).

2. This court, in In re Burden, 917 F.2d 115, 120 (3d Cir. 1990), concluded that "creditor misconduct is not [always] a prerequisite for equitable subordination." Burden involved subordination of a tax penalty in the absence of government misconduct. The Supreme Court, in two recent cases regarding the standards for tax penalty subordination, has refused to decide whether misconduct is required under S 510(c), resolving each case on the principle that "categorical" subordination is not permissible. See United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 229 (1996); Noland, 517 U.S. at 543. We need not here resolve the issue of whether misconduct is always a prerequisite to equitable subordination because the bankruptcy court properly found misconduct.

A. Inequitable Conduct

1. The Legal Sufficiency of the Findings of the
        Bankruptcy Court

CVC acknowledges that it and its representative,
Muqaddam, owed a fiduciary duty to Papercraft and its
creditors at all times relevant here. It asserts, however, that
neither breached a fiduciary duty. It insists that it is not
improper per se for a fiduciary to purchase claims against
the debtor in a bankruptcy at a discount and it stresses
that the bankruptcy court made no finding that the prices
paid for the Papercraft notes were unfair or inequitable at
the time of the purchases.

We accept, arguendo, that the purchase of notes at a
discount by a fiduciary of a debtor in bankruptcy is not
improper under all circumstances,[3] and we acknowledge
the absence of a finding on the fairness of the purchase
price. The bankruptcy court found, however, that the
Papercraft notes (1) were purchased for the dual purpose of
making a profit for CVC on the notes and of being able to
influence the reorganization in its own self-interest, (2) were
purchased with the benefit of non-public information
acquired as a fiduciary, and (3) were acquired without
disclosure of its purchasing plans to the bankruptcy court,
the Papercraft board, the Committee, or the selling note
holders. The bankruptcy court further pointed out that
under Brown v. Presbyterian Ministers, 484 F.2d 998, 1005
(3d Cir. 1973), the opportunity to purchase the notes was
a corporate opportunity of which CVC could not avail itself,
consistent with its fiduciary duty, without giving the
corporation and its creditors notice and an opportunity to
participate.

_____

3. There is authority arguably to the contrary, but, in light of the
findings of the bankruptcy court, we need not, and do not, resolve the
issue here. In Manufacturers Trust Co. v. Becker, 338 U.S. 304, 313-14
(1949) the court observed, ". . . [I]f it is clear [as it is] that a
fiduciary
may ordinarily purchase debt claims in fair transactions during the
solvency of the corporation, the lower federal courts seem agreed that he
cannot purchase after judicial proceedings for the relief of a debtor are
expected or have begun." (citing cases).

10

CVC primarily protests that the bankruptcy court's findings of fact concerning inequitable conduct on its part are clearly erroneous. We will address that contention in the following section. We hold here, however, that the above noted findings reflect ample inequitable conduct to support a subordination remedy. Indeed, those findings make this a paradigm case of inequitable conduct by a fiduciary as that concept has been developed in the case law, and we believe further elaboration is not required. Before turning to an analysis of the record support for these findings, we will only comment briefly on two of CVC's justifications for its conduct.

CVC insists that the opportunity to purchase the notes was not a corporate opportunity, and that notice to Papercraft's Board and the Committee was not required because Papercraft could not have purchased the notes at discount and the members of the Committee had no interest in doing so. We agree with the Committee, however, that CVC's argument is fundamentally at odds with our decision in Brown.

In Brown, we held that the availability of claims for purchase at a discount constitutes a corporate opportunity. After noting that a director of a solvent corporation may take advantage of a corporate opportunity only if he discloses the opportunity to the corporation, we further held that a director of a corporation in bankruptcy owes a fiduciary duty to creditors and cannot seize a corporate opportunity without disclosure to the creditors or their representative. Even though the director in Brown had purchased a note at discount with the consent of the corporation and its stockholders, we concluded that a breach of fiduciary duty had occurred: "The opportunity should have been disclosed to the receiver as representative of the creditors." Id. at 1005.

CVC contends that Brown is distinguishable because Papercraft was not in a financial or legal position to purchase the notes and because the members of the Committee must have been well aware that a market existed in Papercraft debt. It necessarily follows, according to CVC, that neither could have been injured by its purchases. We believe this argument more relevant to the

11

remedy issue than to whether a breach of fiduciary duty occurred. That duty required that it share everything that it knew with Papercraft's board and the Committee before commencing its purchases. Its failure to do so would alone support a subordination depriving it of its profit from the note transactions. The absence of a disclosure in circumstances of this kind makes it extremely difficult to say with confidence what would have happened had no breach of duty occurred4 and that, in itself, is a compelling reason for insisting on disclosure.

CVC also argues that its failure to disclose its identity to note sellers was not inequitable because its identity was not material to the purchases. It stresses that no note sellers have thus far complained. We agree with the bankruptcy court, however, that CVC's identity and purchasing plans were clearly material to the purchase transaction. The fact that CVC, a party with access to inside information, was seeking to purchase over $10 million in Papercraft debt and to steer the reorganization towards a sale to it of Papercraft's assets would certainly have been of interest to a creditor considering a CVC offer to purchase in the summer of 1991.

In short, we agree with the bankruptcy court, the district court, and the Committee that CVC violated its fiduciary duty in a number of significant respects.

2. Record Support for the Bankruptcy Court's Findings

CVC's most fundamental challenge to the factual findings of the bankruptcy court relates to the disclosure issue. It asserts that the court clearly erred in concluding that CVC anonymously purchased the Papercraft notes. While CVC makes no claim that it acted affirmatively to notify anyone

_____

4. If the attention of the Papercraft board and the Committee had been focused on the potential CVC perceived in its note purchases, it is not at all clear that Papercraft or its creditors would have been unable to tap
additional resources, just as CVC did. Either or both might have been able to seize or participate in the opportunity through borrowing, court approved purchases or amendment to the plan of reorganization to include a cash-out option. See, e.g., In re Cumberland Farms, Inc., 181 B.R. 678 (Bankr. D. Mass. 1995).

12

of its purchases prior to the consummation of its purchasing plan, it maintains that the sophisticated investors on the Committee knew that CVC was buying claims and chose to keep quiet about it in order to gain a "litigation windfall" by filing suit once CVC announced its position. Specifically, CVC claims that the courts below clearly erred in finding that the Committee had no knowledge of CVC's claims purchases until after CVC announced its competing reorganization plan.

To support its argument, CVC relies upon minutes of a conference call held by the Committee on April 15, 1991. Those minutes reflect that "there was mention of the fact that American Money [a creditor of Papercraft] had sold its notes to Citicorp." App. at 1558. In addition, CVC points to testimony of the Committee's chair, Pamela Cascioli, that she had been made aware of rumors that CVC had purchased American Money's claims. However, the minutes of the conference call and the testimony of Cascioli were illuminated by witnesses at trial, who testified that the discussion during the conference call lasted thirty seconds and that such rumors are commonplace, generally unfounded, and would not normally warrant additional inquiry. The bankruptcy court credited this testimony and specifically found that, other than the rumor, the "committee heard no more about [claims purchasing activity] until CVC made its asset purchase offer in September of 1991." 187 B.R. at 492. It appears that the bankruptcy court weighed the effect of the rumor in light of the explanatory testimony and credited the Committee's explanation. CVC provides no convincing reason to conclude that this determination was clearly erroneous.5

CVC next challenges the court's finding as to its motive in purchasing the notes. It suggests that it was acting in the best interest of the company by offering a cash-out

_____

5. CVC strenuously argues that the bankruptcy court should not be allowed to simply rest on a credibility determination when documentary evidence supports a different conclusion. However, in this case the documentary evidence was explained by the testimony at trial, which the court found credible. There is nothing unusual about a court finding credible one plausible explanation of the significance of documentary evidence.

13

option to creditors that was not available under the BDK plan. As we have noted, however, the court found that CVC intended to profit not only from the purchase of the notes at discount but also from gaining control of the reorganization. These findings were supported, inter alia, by the testimony of CVC's own people. Muqaddam admitted that he expected to make a profit from the note purchases, and the chairman of CVC stated that those purchases would help CVC "influence something." Id. at 495-96, 500. The evidence clearly permits an inference that CVC was primarily motivated by its own self-interest in purchasing claims. Accordingly, the court did not clearly err in drawing that inference.

CVC also contests the court's determination that its access to material, non-public information as an insider influenced its purchases of Papercraft notes. The court relied upon evidence establishing that Papercraft's then-Chief Financial Officer, Frank Kane, conducted valuations of the company based on CVC's proposed asset purchase -- analyses that were not provided to the Committee. In addition, the court found that some of CVC's information was not public when received, and that CVC was given priority treatment by Papercraft in responding to requests for information. As the court accurately put it, "CVC had virtually unrestricted access to inside information and significant assistance from [Papercraft] through its employees and staff and its control over employees." Id. at 496.

CVC argues that though it was an insider, the information it received did not differ materially from that available to the other creditors, who were all sophisticated institutional investors. The bankruptcy court's conclusion to the contrary is supported, however, by evidence that CVC obtained special financial information andfinancial and tax valuations in order to evaluate its own asset purchase proposal, which was itself directly supported by the note purchases. CVC's argument that the special analyses it received were immaterial rings hollow in light of its use of that information in purchasing claims and preparing its asset purchase offer.

14

In short, our review of the record convinces us that the crucial findings we have referenced as demonstrating inequitable conduct are not clearly erroneous.

B. Injury or Unfair Advantage

As we have noted, the bankruptcy court identified three areas of injury or unfair advantage suffered by the Committee and Papercraft as a result of CVC's secret purchase of claims at a discount. First, the court found that selling note holders were deprived of the ability to make a fully informed decision to sell their claims. Second, the court concluded that CVC diluted the voting rights of members of the Committee. Though CVC ultimately did not vote its claims, the court indicated that its purchased claims secured a position of influence over the reorganization negotiations. Finally, the court held that CVC's actions created a conflict of interest which jeopardized its ability to make decisions in the best interest of the company, free from its competing profit motive.

The district court also found these "injuries and unfair advantages" to be sufficient to warrant an equitable subordination remedy. It emphasized that CVC had "engaged in a comprehensive information collection effort made possible by its position on Papercraft's Board . . . and then used this information to prepare its own asset purchase offer which directly competed with the BDK plan." Op. at 21. While the district court makes no express reference to it, the Committee points us to trial testimony from its financial advisor indicating that this competing reorganization plan and CVC's associated objections to the BDK plan resulted in confirmation delay that inflicted substantial injury on Papercraft's non-selling creditors.

The bankruptcy court did not attempt to quantify the harms caused in economic terms, and CVC characterizes them as "noneconomic" harms. We do not agree with this characterization, however, and, like the bankruptcy and district courts, we conclude that they are sufficient to justify subordination.

15

C. Consistency with the Code

Finally, a remedy of equitable subordination under
S 510(c) must not be inconsistent with other provisions of
the bankruptcy code. This requirement "has been read as a
`reminder to the bankruptcy court that although it is a
court of equity, it is not free to adjust the legally valid claim
of an innocent party who asserts the claim in good faith
merely because the court perceives the result is
inequitable.' " Noland, 517 U.S. at 539 (quoting DeNatale &
Abram, The Doctrine of Equitable Subordination as Applied
to Nonmanagement Creditors, 40 Bus. Law 417, 428 (1985).

CVC makes the argument that other provisions of the
bankruptcy code, including those related to voting of claims
and transfer of claims, provide all the remedy necessary for
inappropriate insider activity. While these provisions may
also be applicable, we perceive no reason why the
availability of alternative remedies makes equitable
subordination under S 510(c) incompatible with the Code
under the circumstances of this case.

IV. THE REMEDY

The bankruptcy court and the district court agreed that
CVC's inequitable conduct warranted a remedy and that, at
a minimum, it should not be permitted to profit by its
purchase of Papercraft notes. Their agreement ended there,
however. The bankruptcy court applied a per se rule that
whenever an insider purchases a claim of a debtor without
disclosure to the debtor and its creditors, that claim will be
"allowed" under S 201 only to the extent of the amount paid
and "recovery on the claim will be limited to the percentage
distribution provided in the plan, as applied to the allowed
claim." 187 B.R. at 491. Having imposed that remedy, the
bankruptcy court concluded that equitable subordination of
CVC's entire claim would "not [be] consistent with the
Code." Id. at 502. As it explained:

> In the instant case we find that the first two[elements
> of equitable subordination] have been met but, because
> of our limitation on the allowance of CVC's claims,
> equitable subordination is not consistent with the
> Code. We have previously held that "principles of

16

> fairness would be violated if insiders who create an unfair advantage for themselves were permitted to share equally with other creditors." In re I.D. Craig Service Corp., 1991 WL 155750 at *7 (Bankr. W.D. Pa. August 8, 1991). Because we are limiting the allowed amount of CVC's claim to the amount it paid for the claims, with recovery under the plan gauged to that amount, we have adhered to principles of fairness without the necessity of subordinating CVC's claim.

Id. at 502.

The district court held that the bankruptcy court's per se remedy did more than deprive CVC of its profit on its investment in Papercraft notes, an objective that could be accomplished by subjecting CVC claims to subordination to the extent necessary to limit its recovery to the amount paid. The district court estimated that the remedy imposed by the bankruptcy court would reduce CVC's recovery approximately $7.5 million below the amount necessary to deprive it of profit. While it acknowledged that subordination beyond that necessary to deprive CVC of profit might be warranted here, it declined to approve further subordination in the absence of appropriate findings. The court thus held:

> [B]ecause it adopted a per se rule, the Bankruptcy Court did not have the opportunity to make factual findings as to how an additional $7,489,941.88 reduction in CVC's recovery comports with the principles of equitable subordination. We do not conclude today, however, that CVC's claims may not be subordinated by such an amount but only that any amount of subordination beyond the limitation of CVC's recovery to the amount paid for such claims should be supported by factual findings and reconciled with the principles of equity. We believe this to be a finding of fact best left to the Bankruptcy Court, not this Court sitting as a court of appeal. Accordingly, we will remand the case to the Bankruptcy Court for a finding on the amount CVC's claims should be subordinated pursuant to the principles of equitable subordination.

17

Op. at 26–27.

We agree with the district court. At a minimum, the remedy here should deprive CVC of its profit on the purchase of the notes. That can be accomplished by subordinating CVC's claim under S 510(c) to the extent necessary in order to limit its recovery to the purchase price of the notes.6 Further subordination may be appropriate, but only if supported by findings that justify the remedy chosen by reference to equitable principles.7 In the absence of such findings, neither the district court nor we are in a position to fulfill our assigned responsibility of review.

By so concluding, we do not suggest that a bankruptcy court can never impose a subordination remedy beyond disgorgement of profit without putting a specific price tag on the loss suffered by those who will benefit from the subordination. Such quantification may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer. A bankruptcy court should, however, attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit

_____

6. We do not read the case law cited by the Committee and the bankruptcy court to suggest the contrary.

7. In the course of reaching its holding, the district court concluded that
S 510(c) is the exclusive remedy available to a bankruptcy court in circumstances like these and that the bankruptcy court was accordingly without authority to fashion a "disallowance" remedy. We do not endorse that conclusion. In Pepper v. Litton, 308 U.S. 295 (1939), the Supreme Court held that the bankruptcy court exercised its statutory responsibilities as a court of equity and indicated that a purchase of claims against a debtor in bankruptcy by a fiduciary, when consistent with principles of equity, may properly lead either to the "disallowance" of the fiduciary's claim or to the subordination thereof. The rationale of Pepper would suggest that under pre-Code law a bankruptcy court was authorized to disallow a portion of the fiduciary's claim when that would produce an equitable result. We find it unnecessary here to resolve the issue as to whether equitable "disallowance" remains an available remedy. The Committee sought subordination under S 510(c), the district court has appropriately remanded this matter to the bankruptcy court for application of S 510(c), and neither side maintains that the authority granted by that section cannot be utilized to fashion a just remedy.

18

a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination. If that is not possible, the court should specifically so find.

Inherent in what we have just said is the equitable principle that any subordination should not result in a windfall to those benefitted by it based on injury to others outside the benefitted class. Stoumbos v. Kilimnik, 988 F.2d 949, 960 (9th Cir. 1993) ("A claim will be subordinated only to the claims of other creditors whom the inequitable conduct has disadvantaged."); Matter of Herby's Foods, Inc., 2 F.3d 128, 131 (5th Cir. 1993) (subordination proper only to the extent necessary to offset the harm the creditors suffered as a result of the inequitable conduct). This principle is applicable here because the Papercraft creditors who sold their claims to CVC will not benefit from any subordination. Accordingly, any injury to them must play no role in determining the extent of any subordination here of CVC's claims. If they consider themselves aggrieved, they must be left to the other remedies afforded them by law.

While we agree with CVC's criticism of the bankruptcy court's remedy, we decline to accept its argument that the record is devoid of any evidence that would support a remedy going beyond disgorgement of profit. Without limiting the inquiry of the bankruptcy court in any way, we note that there is evidence which would support afinding that the non-selling Papercraft creditors suffered injury from CVC's attempt to control the reorganization. While the bankruptcy court held, with record support, that the delay between the filing of the petition and the filing of the disclosure statement was not attributable to CVC's machinations, it made no similar finding with respect to the period of delay between the filing of the disclosure statement and confirmation of the BDK plan. Moreover, while the bankruptcy court found "no evidence that CVC engaged in conduct designed to delay the plan process," if CVC's pursuit of its own interest in fact resulted in delay of the confirmation, we do not read that finding as inconsistent with subordination based on injury resulting from that delay. On remand, the bankruptcy court should consider whether the record supports the proposition that

19

the non-selling creditors suffered loss as a result of a delay in confirmation caused by CVC advocacy of its competing plan and objections to the BDK plan.

V. CONCLUSION

The judgment of the district court will be affirmed. In accordance with that judgment, this case will be remanded to the bankruptcy court for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

20