**In re PAPERCRAFT CORPORATION, Debtors.**

**Committee of Creditors Holding Unsecured Claims and Committee of Creditors Holding Unsecured Claims as Estate Representative of Papercraft, Plaintiffs,**

v.

**Citicorp Venture Capital, Ltd. a New York corporation, Defendants.**

Bankruptcy No. 91–20903 JKF.

Adversary No. 91–2642.

United States Bankruptcy Court,
W.D. Pennsylvania,
Pittsburgh Division.

April 20, 2000.

Stephan M. Ray, K. John Shaffer, Stutman, Treister & Glatt, P.C., Los Angeles, CA, Philip E. Beard, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, PA, for the Committee.

Amy Tonti, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, Jeffrey Deller, Lawrence J. Slattery, Citicorp Legal Affairs, New York City, for Citicorp Venture Capital, Ltd.

Paul K. Vey, Pietragallo, Bosick & Gordon, Pittsburgh, PA.

George Cheever, Kirkpatrick & Lockhart, Pittsburgh, PA.

## MEMORANDUM OPINION [1]

JUDITH K. FITZGERALD, Chief Judge.

### Introduction

This matter is before me on remand from the Court of Appeals. The facts have been detailed in my earlier opinion, 187 B.R. 486 (Bankr.W.D.Pa.1995), the District Court's opinion, 211 B.R. 813 (W.D.Pa. 1997), and the Court of Appeals' opinion, 160 F.3d 982 (3d Cir.1998), and will not be repeated here except to note that Citicorp Venture Capital ("CVC"), an insider of the Debtor owning a 28 percent equity interest in Debtor's parent company, bought notes from creditors of Debtor through brokers without disclosing its identity as a fiduciary and insider of the Debtor. My findings of fact were upheld on appeal by the District Court and the Court of Appeals. The District Court, however, reversed with respect to the remedy imposed. The Court of Appeals affirmed the District Court. The matter is before me now on remand for consideration of the appropriate reme-

dy in light of the harm visited by CVC's conduct.

This court ruled that the amount of CVC's claim would be limited to the amount it paid for the claims, not to the face value of the notes purchased which constituted the claims. I also held that distribution to CVC on its reduced claim would be limited to the percentage distribution provided in Debtor's plan, as applied to the allowed claim. *In re Papercraft Corporation*, 187 B.R. 486, 491 (Bankr.W.D.Pa.1995).

The District Court, while agreeing that CVC should not profit from its conduct, reversed on the basis that I had created a per se rule to apply to all insider trading undertaken without disclosure and had no authority to do so. The District Court noted that § 510 of the Bankruptcy Code exists to address inequitable conduct by insiders and that a per se rule "removes the principles of equity and applies instead a universal penalty for any instance of noncompliance." *In re Papercraft Corporation*, 211 B.R. 813, 822–24 (W.D.Pa. 1997).

The District Court held that my finding of injury to creditors or unfair advantage to CVC based on its inequitable conduct was supported by the evidence and not clearly erroneous. The District Court instructed me to make findings as to the appropriate amount of the limitation on CVC's claim, finding that I did not sufficiently support the amount of the limitation I imposed on CVC's recovery and did not reconcile the limitation with the principles of equity. The District Court did

> not conclude . . ., however, that CVC's claims may not be subordinated by such an amount but only that any amount of subordination beyond the limitation of CVC's recovery to the amount paid for

---

1. The court's jurisdiction was not at issue. This Memorandum Opinion constitutes my findings of fact and conclusions of law. I incorporate the findings made on the record on July 7, 1999, at the hearing on arguments to determine whether the record should be reopened on remand. I conclude that there is

no need to reopen the record inasmuch as the parties were afforded the opportunity to litigate all issues at trial. Moreover, the record contains sufficient evidence of quantifiable harm to subordinate CVC's claim beyond simply removing its profit, as is explained in the Opinion proper.

such claims should be supported by factual findings and reconciled with the principles of equity.

*In re Papercraft Corporation,* 211 B.R. 813, 827 (W.D.Pa.1997).

The Court of Appeals held that

(1) my findings of inequitable conduct were not clearly erroneous. In fact, the Court of Appeals held that those "findings [of fact] make this a paradigm case of inequitable conduct by a fiduciary as that concept has been developed in the case law . . . .", *Citicorp Venture Capital, Ltd. v. Committee of Unsecured Creditors (Papercraft Corp.),* 160 F.3d 982, 987 (3d Cir. 1998);

(2) the injury or unfair advantage that was found to exist by the bankruptcy and district courts was sufficient to justify equitable subordination of CVC's claim; and

(3) equitable subordination as a remedy is consistent with the Bankruptcy Code.

The Court of Appeals agreed with the District Court that CVC should be deprived of its profit and "[t]hat can be accomplished by subordinating CVC's claim under § 510(c) to the extent necessary in order to limit its recovery to the purchase price of the notes." 160 F.3d at 991. The Court further stated, however, that it was not requiring "a specific price tag" to justify every remedy beyond disgorgement of profit, *id.,* and that further subordination had to be "supported by findings that justify the remedy chosen by reference to equitable principles . . . ." so that an appellate court can determine the proportionality of the remedy to the injury suffered by those benefitting from the subordination. *Id.*

The Court of Appeals disagreed with the District Court's conclusions that § 510(c) is necessarily the exclusive remedy available to me and disagreed that I am without authority to fashion a disallowance remedy. 160 F.3d at 988, n. 7, citing *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), a pre-Code case.

However, the Court of Appeals required that the

bankruptcy court should . . . attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination. If that is not possible, the court should specifically so find.

160 F.3d at 991. The Court held that injury to the selling noteholders was not a factor to be considered. It also noted the existence of evidence that would support a finding that the nonselling noteholders were injured by CVC's conduct which caused the delay in the confirmation of the plan.

With respect to the elements of equitable subordination, the Court of Appeals recited:

Before ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code.

*Papercraft Corporation,* 160 F.3d 982, 986–87 (3d Cir.1998), citing *U.S. v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996).[2] In my opinion of October 12,

---

**2.** 11 U.S.C. § 510(c) provides:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

Only subsection (1) is applicable in the matter before us.

1995, I found the first two elements to have been satisfied but withheld subordination on the third element because of the form of per se remedy I imposed. In this opinion, therefore, I address the evidence to determine whether subordination is consistent with the Bankruptcy Code.

■ An examination of the evidence and the Court of Appeals' decision in this case leaves no question that subordination of CVC's claim is consistent with the Bankruptcy Code and appropriate under the facts of this case. Subordination to the extent that it permits CVC to recover no more than the amount it paid for its claims is the minimum remedy to be imposed. The Court of Appeals held that CVC's fiduciary duty required it to "share everything it knew with Papercraft's board and the Committee before commencing its purchases" and that "[i]ts failure to do so would alone support a subordination depriving it of its profit from the note transactions." 160 F.3d at 988. At this point my task is to identify specific harm, if any, supporting a remedy more drastic than subordination of the claim beyond removing all profit.

The Court of Appeals opined that where the harm to be redressed is not quantifiable, "it should not redound to the benefit of the wrongdoer" but the court "should, however, attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding a proportionality of the remedy to the injury that has been suffered by those who will benefit from this subordination", if possible. 160 F.3d at 991.

### Discussion

■ On the issue of what facts support equitable subordination and what harm is quantifiable, I find from the trial record as supplemented by the court's docket, of which I take judicial notice, that CVC's conduct resulted in three categories of economic harm to non-selling noteholder creditors. The first two encompass (a) the delay in confirming the plan which resulted in harm that is quantifiable in terms of dollars and (b) the uncertainty over the amount of CVC's claim distribution thereon that is not easily quantifiable. The third relates to the filing of this adversary which, through the appellate and remand process, has created a delay in fully implementing the confirmed plan of over four years from the date of my initial opinion (October 12, 1995) to today and of eight years since this adversary was filed on October 31, 1991. At the very least, while this adversary has been pursued through three courts and five proceedings,[3] this delay has caused Debtor to incur professional fees and expenses and additional U.S. Trustee quarterly fees which must be paid until the case is, *inter alia,* closed. *See* 28 U.S.C. § 1930(a)(6); *United States Trustee v. Gryphon at the Stone Mansion, Inc.,* 166 F.3d 552, 554 (3d Cir.1999).

### 1. *Delay in Plan Confirmation*

In my 1995 opinion I stated that "[t]here was no evidence that CVC engaged in conduct designed to delay the plan process", 187 B.R. at 501, and that "[t]here was insufficient evidence to establish that CVC purchased claims with the intent to harm Debtor or defraud its creditors." *Id.* Notwithstanding lack of evidence that CVC's INTENT was to delay the process in order to harm creditors, there was more than enough evidence to establish that CVC's conduct did, in fact, delay it and that CVC's intent was to benefit itself over and above other creditors to whom it owed a fiduciary duty *not* to self-deal. In requiring Debtor to furnish the financial in-

---

**3.** The motion for summary judgment, two opinions by this court (excluding this one) and a trial, two appeals, and the hearing after remand in which the parties presented arguments to determine whether the record should be reopened in light of the Court of Appeals' opinion. After argument and consideration of the parties' briefs and the rec-
ord, I conclude that the record need not be reopened. All of this, however, has resulted in increased attorneys' fees and costs and increased post-confirmation U.S. Trustee fees. In addition to litigation expenses, professional fees have been increased in fulfilling this court's requirement that status reports be filed during the pendency of the appeals.

formation described below, CVC caused Debtor to divert its resources from reorganization activities it should have undertaken, i.e., preparing the disclosure statement that was to accompany what is now called the BDK plan of reorganization filed at the outset of the case.

When a chapter 11 plan which has been approved by creditors prepetition is filed early in the case, a disclosure statement explaining the basis for the plan should be filed with that plan or shortly thereafter. In fact, the record shows that this was the expectation of all parties when the case was filed. The expectation was not realized in this case because CVC used its insider position to get information from the Debtor that it needed in order to facilitate its claim purchasing. Its claim purchases gave CVC leverage in the reorganization process and enabled it to control votes which, in turn, facilitated its purchase offer. The purchase offer was memorialized in the unusual occurrence of Debtor's filing a competing plan of reorganization (the CVC plan) that proposed an entirely different reorganization (i.e., a sale to Citicorp) from the BDK plan originally filed by Debtor and which Debtor did not withdraw. The Committee's requests for information which would enable it to assist Debtor in drafting the disclosure statement were stymied while Debtor provided information to CVC and delayed providing it to the Committee. *See* Declaration of Samuel M. Victor In Support of Equitable Subordination of CVC's Claims (hereafter "Victor Declaration"), Adv. Docket # 116 attached to Appendix of Opening Brief of Committee, Adv. Docket # 189 at ¶ 14. In that way, CVC caused the delay in Debtor's filing of the disclosure statement for the initial BDK plan and created significant unnecessary expense to this estate—in the millions of dollars in terms of a combination of professional fees, litigation expenses and U.S. Trustee quarterly fees due as the result of a statutory amendment to 28 U.S.C. § 1930(a)(6) and the Third Circuit Court of Appeals' decision in *United States Trustee v. Gryphon at the Stone Mansion, Inc.*,

166 F.3d 552 (3d Cir.1999). CVC's willful conduct in its own self interest in violation of its fiduciary duties to Debtor, the estate and its creditors is sufficient justification for further subordination of its claim to account for the increased costs and expenses it caused the estate so that its recovery is reduced beyond mere removal of its profit.

While CVC was maneuvering behind the scenes, it was tying up Debtor's resources by having Debtor modify financial projections that Debtor had prepared for the Committee and had turned over to CVC. CVC also obtained projections of working capital and income distributions and asked for a monthly model for an income statement, balance sheet and cash flow so that CVC would know the working capital changes and income statement movement within a prescribed period of time with respect to the two valuable operating subsidiaries of Debtor (Barth & Dreyfuss and Knomark). 187 B.R. at 493, 496 n. 8. By virtue of CVC's position in having a director on Debtor's board, CVC's requests for information always received priority over the Committee's.

Postpetition, Debtor repeatedly sought extension of the exclusive period of § 1121(b). It was during this delay that CVC purchased sufficient claims to garner a blocking position for the BDK plan and obtained the information upon which to base its asset purchase offer contained in the CVC plan it caused Debtor to file. Although there was an attempt to blame the delay in filing the BDK disclosure statement on what has been called the Second Pennsylvania litigation, (essentially a landlord-tenant dispute) once the disclosure statement was filed that litigation resolved. This court stated several times during the case before the disclosure statement was filed that there was no reason for the Second Pennsylvania litigation to stall the filing of the disclosure statement. Also involved was an issue regarding American Technical Industries, Inc. ("ATI") which affected Debtor's restructuring. However, the plan was filed almost simultaneously with the bankruptcy

petition, so the ATI issue must have been considered prepetition. *See* 187 B.R. at 501. The ramifications of both issues could have been explained in the disclosure statement and treated in the alternative (or as a range of distributions depending upon the outcome of the litigation) in the plan. Accordingly, there was no basis upon which to delay the filing of the disclosure statement caused by either the Second Pennsylvania or ATI issues. CVC's conduct, not the Second Pennsylvania litigation or ATI issues, caused the delay in plan confirmation.

I find that CVC caused the delay between the filing of the BDK disclosure statement and the confirmation of the BDK plan. CVC objected to confirmation of the BDK plan, even though it was one which CVC helped negotiate prepetition as a member of Debtor's board of directors. The credible evidence supports the conclusion that CVC instigated the stall in order to further pursue its self interest in having Debtor present CVC's alternative plan. This caused specific economic harm and further litigation and attendant professional fees and costs.

### 2. *Quantifiable Economic Harm*

The evidence related to the quantifiable harm includes the following. In his declaration submitted with respect to the trial, Samuel Victor of Chanin & Co., financial advisor to the Committee, stated that in his opinion the value of BDK (the reorganized debtor) stock was depressed due to CVC's disputed claim to approximately 40 percent of the reorganized Debtor. *See*

Supplemental Remand Brief of the Committee, Adv. Docket # 199, at 13, 16; Victor Declaration at ¶ 22. He also stated that the delay in confirmation resulted in "foregone interest income on their debt securities distributed pursuant to the BDK Plan." Victor Declaration at ¶ 26.[4]

The trial record reflects that as of October, 1994, administrative expenses during the delay in plan confirmation totaled $1,248,000.[5] Victor Declaration at ¶ 26. Mr. Victor included all administrative costs incurred during the four month delay in this total because the Committee was not aware of CVC's actions in purchasing its claims. Thus, the Committee was unable to factor out any particular task for which a fee was incurred as attributable to something other than the delay. *See* Trial Transcript of November 14, 1995, at 71–72. Moreover, once the CVC plan was filed it became necessary for the Committee to address it. Any fees and expenses incurred in connection with the CVC plan, therefore, are attributable to CVC's undisclosed claims purchases and constitute a direct economic harm to the estate.

The trial evidence also established that creditors lost "approximately $956,250 on their debt securities distributed pursuant to the BDK plan."[6] *Id. See* note 4, *supra.* At trial Mr. Victor explained that the interest was lost because creditors could not receive their new securities and, therefore, were unable to earn interest. Trial Transcript of November 14, 1995, at 76–77.

CVC's willful conduct in its own self interest in violation of its fiduciary duties

---

4. Mr. Victor calculated the interest as follows: "In connection with the BDK Plan, creditors received new debt securities with a face value of $33,750,000 with an annual interest rate on the debt securities of 8.5%. On a monthly basis, this translates into $239,062 of lost income incurred as a result of the delay in confirming the BDK Plan. Again, assuming a four month delay due to the actions of CVC, the cost to creditors in the aggregate is $956,250."
Victor Declaration, *supra*, at ¶ 26b.

5. The figures used herein are based on an estimate of a delay of four months. *See* Vic-

tor Declaration at ¶ 26. I find the four month delay to be a conservative estimate inasmuch as the BDK plan was filed shortly after the bankruptcy case was filed in March of 1991 and the plan was not confirmed until January 21, 1992.

6. This figure was increased in the Committee's Supplemental Remand Brief to over $1 million in lost interest and dividends and more than $2 million in postconfirmation attorneys fees and expenses. However, we accept the trial record as the evidence.

to Debtor, the estate and the creditors is a sufficient basis upon which to further subordinate its claim so that its recovery is reduced beyond the amount it paid for the claims to account for the increased costs, expenses, and lost interest it caused to the estate.

### 3. *Uncertainty Over the Amount of CVC's Claim*

This harm is not quantifiable but results from the creditors of the estate not knowing what their final distribution will be and, to the extent potential investors in the Reorganized Debtor exist, uncertainty with respect to the extent of CVC's interest in the new company. The latter has the potential to affect both existing shareholders and/or purchasers' negotiating strategies and investors' decisions with respect to the new entity. For example, even if there were a market for shares of the Reorganized Debtor, and I make no findings on this point, that market would be adversely affected because no shareholder can know the extent of his holdings until the proceedings in this adversary conclude and the amount of CVC's claim is determined once and for all.

### 4. *The Adversary and Resulting Litigation*

The third type of economic harm caused by CVC's undisclosed claims purchasing relates directly to this adversary. The Committee filed it to redress the harm caused by CVC and the fees and costs incurred for its prosecution have further minimized available funds in the reorganized entity. I cannot calculate the total dollar cost from the existing record. I will require additional submissions to permit that calculation.

7. The plan was confirmed on January 21, 1992.

8. The total amount of the U.S. Trustee post-confirmation quarterly fees is not of record at this time.

9. CVC has no basis upon which to challenge the amount of the U.S. Trustee post-confirma-

During the pendency of the appeals from my 1995 order I required the filing of periodic reports with respect to the amount of compensation paid and expenses reimbursed to professionals for services rendered to the Committee. The Twenty–Fifth Report on Compensation Paid and Expenses Reimbursed, Bankruptcy case docket # 950, reflects a total of $3,242,-396.73 incurred post-confirmation in professional fees and expenses on behalf of the Committee from February 15, 1992,[7] through January, 2000. From the reports, which set out only amounts paid but not an itemization of the nature of the services performed, I cannot discern whether all these fees and expenses are attributable to this Adversary. However, to the extent they are, CVC's distribution under the plan should be further subordinated by that amount. The reports do not include U.S. Trustee post-confirmation quarterly fees which have been paid, according to the docket, through the third quarter of 1999.[8] *See* Statement of United States Trustee in Response to 08/26/99 Order of Court, filed September 24, 1999, main docket # 948. The Committee will be given an opportunity to file a statement of fees and expenses related to this adversary, incurred through the date of this opinion. The Committee also shall be required to obtain and file a statement of U.S. Trustee post-confirmation quarterly fees paid. CVC shall have an opportunity to respond to the Committee's submission with respect to the fees and expenses incurred from the date the adversary was filed.[9]

### Other Issues

There are two other issues to be addressed that have been raised by CVC on

tion quarterly fees inasmuch as those fees are statutory and their accrual is directly caused by CVC's conduct. That is, but for CVC's wrongdoing, this bankruptcy case would have been closed shortly after plan confirmation on January 21, 1992, well before Congress amended 28 U.S.C. § 1930 to require payment of post-confirmation fees.

this remand. CVC would like me to re-evaluate the value of the BDK units (what the confirmed plan provides creditors in classes 4 and 8 in lieu of cash) [10] in light of their fair market value as now evidenced by, CVC alleges, the fact that (1) BDK, the reorganized Debtor, has not yet been sold despite confirmation of the plan eight years ago and (2) CVC would not be able to sell its BDK units if it had received them and, therefore, CVC has not received a profit. I reject this method of valuation in this instance. Valuation of BDK units was determined at the time of plan confirmation to be $1,228 per unit and no different valuation was presented at the trial of this Adversary even though one issue tried was equitable subordination. Other (non-selling) creditors have received distribution based on that valuation. It would exacerbate the harm to these creditors if BDK units were valued differently now and only for CVC's claim. The operative date of valuation for plan purposes and for purposes of this adversary was the date of plan confirmation. CVC must live with the situation it created. The District Court, in examining CVC's profit, also used the values established at the plan confirmation hearing. Accordingly, the

original analysis showing that CVC paid $10,553,541.88 for what turned out to be $15,987,600 in value (BDK Units) under the plan is adopted for purposes of this opinion.[11]

CVC contends that my initial finding that CVC's conduct constituted improper usurpation of a corporate opportunity cannot stand unless the committee shows that the corporate opportunity would have been taken advantage of by appropriate parties. I need not consider this matter as all of my findings have been sustained on appeal and the only issue on remand is whether CVC's claim should be equitably subordinated beyond removal of its profit. However, I note that whether another entity would have availed itself of the opportunity is irrelevant. As the Court of Appeals pointed out in its opinion,

> under *Brown v. Presbyterian Ministers*, 484 F.2d 998, 1005 (3d Cir.1973), the opportunity to purchase the notes was a corporate opportunity of which CVC could not avail itself, consistent with its fiduciary duty, without giving the corporation and its creditors notice and an opportunity to participate.

160 F.3d at 987.[12]

Based on the foregoing, we find that CVC's claim should be subordinated so

---

**10.** Class 8 consists of all allowed claims that are equitably subordinated. Class 4 contains all allowed prepetition unsecured claims not otherwise classified in Classes 1, 3, 5, 6, or 7 relating to First and Second Priority Notes except for equitably subordinated claims. *See* BDK Plan at 9–10, Bankr.No. 91–20903, Docket # 545.

**11.** In its Reply Brief to the Committee's Supplemental Brief CVC argues that the cash value of its claim and recovery should be the appropriate measurement of any profit. CVC further asserts that because it did not receive cash and because the valuation of BDK units at plan confirmation was only for the purpose of arriving at an enterprise value of the reorganized Debtor, it is now necessary to recalculate value to determine CVC's profit. Reply Brief of Citicorp Venture Capital, Ltd. to Supplemental Brief of Committee, Docket # 201, at 3–5 and note 11 thereto. CVC has provided no authority for its argument that its claim should be valued on a basis different from

that of all other creditors. To do so would be inequitable to other creditors, at least under the circumstances of this case. To achieve parity in distribution in these classes as the Bankruptcy Code requires, the court must maintain the same valuation method utilized for all distributions of BDK units to creditors in classes entitled to them. All creditors in the affected classes will sustain the same increase or diminution in the value of their holdings as CVC. Moreover, the parties had a full opportunity to litigate all issues at trial and specifically requested, prior to trial, that I withdraw my opinion on summary judgment so that the equitable subordination issues could be addressed. I did so and the case was tried in November of 1994 to address these issues. Reopening the record over 5 years after trial concluded would violate principles of finality and create a never-ending round robin of litigation.

**12.** The court of appeals accepted "arguendo, that the purchase of notes at a discount by a

that its profit is removed and the nonselling creditors are compensated for (1) lost interest, (2) the reduction in amounts available to creditors as reflected in the increased administrative and professional fees and expenses and (3) post-confirmation U.S. Trustee fees the Debtor was required to pay. To the extent CVC has an allowed Class 4 (unsubordinated) claim and receives BDK units, it will share in the distribution to that class.

fiduciary of a debtor in bankruptcy is not improper under all circumstances." 160 F.3d at 987. However, it recognized that "[t]here is authority arguably to the contrary, but, in light of the findings of the bankruptcy court, we ... do not[] resolve the issue here.... [I]t is clear ... that a fiduciary may ordinarily purchase debt claims in fair transactions during the solvency of the corporation." *Id.* at note 3 (citations omitted). However, "the lower federal courts seem agreed that he cannot purchase after judicial proceedings for the relief of a debtor are expected or have begun." *Id.*